# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

SHERIDAN PHILLIP HEDRICK,

                    *Plaintiff*,                COMPLAINT

v                                        Case No.:

WESTERN MICHIGAN UNIVERSITY,
WESTERN MICHIGAN UNIVERSITY BOARD
OF TRUSTEES; NICOLE ALLBEE, individually
and in her official capacity;
DIANE ANDERSON, individually and in
her official capacity; and
EDWARD MONTGOMERY, individually
and in his official capacity,

                    *Defendants*,
_____

Eric J. Sheppard, P71914
Attorney for Plaintiff
2109 Hamilton Road, Suite 206
Okemos MI 48864
Ph: 517-618-1580
Fx: 517-913-6321
ericsheppard16@gmail.com

_____

NOW COMES, the Plaintiff, Sheridan Phillip Hedrick, by and through his attorney, Eric J. Sheppard, and for his Complaint against the above-named Defendants and their employees, agents, and successors in office, states as follows:

## INTRODUCTION

1.     This is a school discipline case involving the permanent expulsion of Plaintiff, Sheridan Phillip Hedrick ("Sheridan"), from Western Michigan University ("WMU").

2. This case involves expressive conduct and protected speech under the **First Amendmen**t.

3. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v Johnson*, 491 US 397; 109 S Ct 2533 (1989). "The hallmark of the protection of free speech is to allow 'free trade in ideas' – even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v Black*, 538 US 343; 123 US 1536 (2003). "Speech may not be banned on the ground that it expresses ideas that offend." *Matal v Tam*, 582 US __; 137 S Ct 1744 (2017). And "speech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 US 443 (2011).

4. The United States Supreme Court has made clear that students do not "shed their constitutional rights to freedom of speech or expression" even "at the school house gate." *Tinker v Des Moines Independent Community School Dist*, 393 US 503; 89 S Ct 733 (1969); *Mahanoy Area School District v BL*, 141 US 2038 (2021).

5. The First Amendment applies to discipline decisions for students at public colleges and universities. *Healy v James*, 408 US 169; 92 S Ct 2338 (1972) ["[s]tate colleges and universities are not enclaves immune from the sweep of the First Amendment."]; *Papish v Board of Curators of University of Missouri*, 410 US 667; 93 S Ct 1197 (1973).

6. And the First Amendment applies to social media. *Packingham v North Carolina*, 137 S Ct 1730 (2017).

7. A State cannot punish citizens for engaging in constitutionally protected speech. And a public college or university cannot discipline and permanently expel students who engage in constitutionally protected speech.

8. This case involves a video that Sheridan made on a private cell phone, off-campus from WMU, and which Sheridan shared via private Snapchat messages to a close group of friends.

9. Defendants acted outside of the scope of their authority and violated Sheridan's clearly established rights under the First Amendment by permanently expelling Sheridan from WMU.

10. The cell phone video that Sheridan made and shared was protected speech and: (a) was not a **"true threat"** as defined by state and federal law, (b) was not a communication made "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," (c) could not possibly be considered a true threat under state and federal law, and (d) was not sent to any recipient that reported feeling threatened by the cell phone video. *People v Gerhard*, COA: 354369 (Mich App 2021), Published June 24, 2021; *In re JP*, 330 Mich App 1; 944 NW2d 422 (2019); *Elonis v United States*, 575 US 723; 135 S Ct 2001 (2015); *People v Osantowski*, 274 Mich App 593; 736 NW2d 289 (2007).

11. And Sheridan did not otherwise threaten, intimidate, harass, or coerce any person at WMU or anywhere else. WMU produced zero witnesses and zero evidence to even allege that Sheridan engaged in stalking behavior or harassment, beyond false third-hand allegations from a misinformed father of a student at WMU – who had no personal

3

knowledge of anything. WMU failed to even investigate whether Sheridan committed any alleged stalking or harassing behavior.

12.     Sheridan is not being investigated for, and has not been charged with: (a) terroristic threats under MCL 750.543m and MCL 750.543b(a), (b) transmitting in interstate commerce "any communication containing any threat…to injure the person of another" under 18 USC § 875(c), or (c) any other state or federal crime.

13.     And Sheridan is not being investigated for, and has not been charged with, any stalking behavior or harassment as defined in Michigan law. There has never been a personal protection order sought or entered against Sheridan. And Sheridan has always lived, and continues to live, in the same apartment complex as the student whose misinformed father called in false information to WMU Public Safety.

14.     Further, even if analyzed under a ***Tinker* and *Mahanoy* framework**, Sheridan's cell phone video in this case did not: (a) materially and substantially interfere with the requirements of appropriate discipline in the operation of WMU, (b) materially disrupt classwork at WMU, (c) involve substantial disorder or invasion of the rights of others of anyone at WMU, and (d) give rise to demonstrable factors that would give rise to any reasonable forecast by WMU of substantial and material disruption. This is particularly true given the content and context of Sheridan's cell phone video and WMU's response to Sheridan's cell phone video – a joke video and non-threatening video that did not name or reference WMU or any student or staff member of WMU, based upon a popular TikTok trend, made off-campus on a private cell phone, privately sent to a small group of close friends – none of whom ever contacted law enforcement themselves – and where WMU and law enforcement interviewed Sheridan and concluded that Sheridan was not a

threat to himself or others. The police neither sought any criminal charges against Sheridan nor instructed anyone that a personal protection order should be sought and issued against Sheridan. And WMU never put in place any interim measures to prohibit Sheridan from attending in person classes at WMU and having contact with any other students involved in any allegations that were waged against Sheridan.

15.     Moreover, no actual disruption, no disturbances, and no disorders occurred on the school premises of WMU. No adverse witnesses appeared for Sheridan's disciplinary hearing for this case. And WMU failed to compel the attendance of any students that were involved in any allegations that were waged against Sheridan. WMU failed to present any evidence that any WMU student or staff was impacted by Sheridan's cell phone video in any way; and WMU failed to present any evidence from any students regarding false allegations that Sheridan engaged in stalking or harassing behavior.

16.     "[U]ndifferentiated fear or apprehension of disturbance" is not sufficient. Substantial and material disruption is a "demanding standard" that is not satisfied by "discomfort" or "unpleasantness" from school officials. And WMU's action in permanently expelling Sheridan was not reasonable. *Tinker v Des Moines Independent Community School Dist*, 393 US 503; 89 S Ct 733 (1969); *Mahanoy Area School District v BL*, 141 US 2038 (2021); *Lowery v Euverard*, 497 F 3d 584 (6th Cir 2007); *DB v Lafon*, 217 F Appx 518 (6th Cir 2007).

17.     Further, WMU committed **<u>First Amendment retaliation</u>** against Sheridan. Sheridan engaged in protected conduct, WMU retaliated against Sheridan for engaging in protected conduct, and WMU's decision was motivated by Sheridan's protected conduct.

*Thaddeus-X v Blatter*, 175 F3d 378 (6th Cir 1999). This violated Sheridan's clearly established rights.

18. Further, WMU and its Board acted with **deliberate indifference** and **failed to train** its employees in First Amendment law and precedent, and proper procedure and due process standards, in handling student discipline. *Monell v City of New York City Dep't of Social Servs*, 436 US 658 (1978); *Pembaur v City of Cincinnati*, 475 US 469 (1986); *City of Canton v Harris*, 489 US 378 (1989). This violated Sheridan's clearly established rights.

19. Further, in the course of permanently expelling Sheridan from WMU, WMU violated Sheridan's **procedural due process rights** and his clearly established rights. Sheridan has a protected property interest in his continued education. Sheridan has a protected liberty interest his good name, reputation, honor, and integrity. And Sheridan can show a stigma, plus his protected property interest, in his continuing education. *Goss v Lopez*, 419 US 565; 95 S Ct 729 (1975); *Flaim v Med Coll of Ohio*, 418 F 3d 629 (6th Cir 2005); *Doe v University of Cincinnati*, 872 F 3d 393 (6th Cir 2017); *Doe v Miami University*, 882 F 3d 579 (6th Cir 2018); *Jaksa v Regents of Univ of Mich*, 597 F Supp 1245 (ED Mich 1984); *J Endres v Northeast Ohio Med Univ*, 938 F3d 281 (6th Cir 2019); *Wisconsin v Constantineau*, 400 US 433; 91 S Ct 507 (1971); *Paul v Davis*, 424 US 693 (1976); *Miskowski v Martin*, 57 Fed Appx 246 (6th Cir 2003).

20. Sheridan has been prejudiced by the decisions of WMU and by WMU's continuing violation of Sheridan's rights; and Sheridan's information and defense to the allegations against him would have led to a different outcome but for WMU's violation of Sheridan's rights. *Baynes v Cleland*, 799 F 3d 600 (6th Cir 2015); *Brosseau v Haugen*,

543 US 194 (2004); *Mendoza-Garcia v Barr*, 918 F 3d 498 (6th Cir 2019); *Sako v Gonzales*, 434 F 3d 857 (6th Cir 2006). This violated Sheridan's clearly established rights.

21.     Moreover, WMU: (a) failed to provide Sheridan with the appropriate notice of the allegations against Sheridan, including written notice, (b) failed to identify and produce any accuser of any alleged misconduct against Sheridan, (c) failed to provide Sheridan with the names of witnesses and a list of other evidence the school intended to present against Sheridan, (d) failed to provide Sheridan with a meaningful opportunity to present a defense, (e) failed to provide Sheridan with an opportunity to explain his version of the facts, (f) failed to provide Sheridan with a neutral and impartial decision-maker, and (g) failed to provide Sheridan, or his agent, with the opportunity to cross-examine any accuser and any adverse witness in the presence of a neutral fact-finder – where WMU's determination turns on the credibility of the accuser, the accused, or other witnesses. *Doe v University of Cincinnati*, 872 F 3d 393 (6th Cir 2017); *Doe v Baum*, 903 F 3d 575 (6th Cir 2018); *Newsome v Batavia Local Sch Dist*, 842 F 2d 920 (6th Cir 1988); *Withrow v Larkin*, 421 US 35; 95 S Ct 1456 (1975) ("a biased decisionmaker [is] constitutionally unacceptable"). This violated Sheridan's clearly established rights.

22.     Further, WMU violated Sheridan's **<u>substantive due process</u>** rights by depriving Sheridan of his constitutionally protected right to continued enrollment at WMU, which has been assumed, *arguendo*, by United States Supreme Court, in cases involving college students who challenge dismissals from state universities. *Megenty v Stenger*, 27 F 3d 1120 (6th Cir 1994); *Regents of Univ of Mich v Ewing*, 474 US 214; 106 S Ct 507 (1985); *Bd of Curators v Horowitz,* 435 US 78; 98 S Ct 948 (1978).

23. WMU deprived Sheridan of his protected property interests: in his continuing education and in a transcript unmarred by a permanent expulsion on his record. WMU's decision to permanently expel Sheridan was done in violation of Sheridan's constitutionally protected First Amendment rights, was patently unreasonable, and was disproportionate to any alleged offense that WMU asserts that Sheridan committed. And WMU's decision to permanently expel Sheridan was arbitrary and capricious, not supportable on any rational basis, was a willful and unreasoning action, was without consideration and in disregard of the facts and circumstances of Sheridan's case, and shocks the conscience. *Valot v Southeast Local Sch Dist Bd of Educ*, 107 F 3d 1220 (6th Cir 1997); *Silver v Franklin Twp Bd of Zoning Appeals*, 966 F 2d 1031 (6th Cir 1992); *Pearson v City of Grand Blanc*, 961 F 2d 1211 (6th Cir 1992) (quoting *Stevens v Hunt*, 646 F 2d 1168 (6th Cir 1981); See also *Ala & Coushatta Tribes v Big Sandy Sch Dist*, 817 F Supp 1319 (ED Tex 1993).

24. Further, there is no sufficient post-deprivation remedy sufficient to absolve WMU of its constitutional violations in this case. *Parratt v Taylor*, 451 US 527; 101 S Ct 1908 (1981).

25. Further, WMU **breached its contract** with Sheridan, breached any implied contract with Sheridan, and would be bound by promissory estoppel regarding its decision to permanently expel Sheridan. *Anderson v Vanderbilt Univ*, 450 F App'x 500 (6th Cir 2011); *Faparusi v Case W Reserve Univ*, 711 F App'x 269 (6th Cir 2017).

26. Further, WMU violated Sheridan's **freedom of speech rights under the Michigan Constitution of 1963. Article I, § 5.**

27.     This case seeks to protect and vindicate statutory and fundamental, clearly established constitutional rights. Sheridan brings a civil rights action under the First Amendment and Fourteenth Amendment to the United States Constitution and 42 USC § 1983 and for other statutory and constitutional violations, challenging Defendants' acts, policies, practices, customs, and procedures, which deprived Sheridan of his rights.

28.     The actions, policies, practices, customs, and procedures of Defendants were the cause of and the moving force behind the statutory and constitutional violations in this case.

29.     Sheridan brings this action for **money damages** and the following:

   A. **prospective injunctive and declaratory relief** compelling WMU to comply with federal law and to end a continuing and ongoing violation of federal law and Sheridan's clearly established rights. *Ex Parte Young*, 209 US 123; 28 S Ct 441 (1908); *S & M Brands, Inc v Cooper*, 527 F 3d 500 (6th Cir 2008)

   B. a **declaration** that WMU acted unconstitutionally and violated Sheridan's clearly established rights by WMU's continuing and ongoing violation of federal law

   C. **reinstatement** of Sheridan to WMU to allow Sheridan to return to WMU and complete his diploma at WMU, which is prospective in nature. *Carten v Kent State University*, 282 F 3d 391 (6th Cir 2002)

   D. for a complete **expungment** of any reference to an expulsion, and any events related to those actions, from Sheridan's transcript and complete records and student file

   E. for **changes** to the **policies, practices, customs, and procedures** of WMU regarding punishing students for protected speech that occurs off-campus

F. for **changes** to the **policies, practices, customs, and procedures** of WMU regarding conducting student disciplinary proceedings and WMU's ongoing and continuing violation of federal law. *MacDonald v Vill of Northport, Mich*, 164 F 3d 964 (6th Cir 1999) – by compelling WMU to take action that includes, but is not limited to, (i) naming any accuser who makes a complaint against a student involved in a disciplinary proceeding, (ii) providing an accused student with written copies of all records, documents, reports, and information that WMU and its staff rely upon in making a disciplinary decision, (iii) compelling adverse witnesses to appear or be available for an appearance at a disciplinary hearing, (iv) allowing cross examination of the accuser and any adverse witnesses in the presence of a neutral fact-finder for all disciplinary hearings where credibility is at issue, and (v) allowing an agent or support person to assist in the disciplinary hearing, including the ability to speak and to cross examine any witnesses where credibility is at issue. Implementing such changes will not impose undue fiscal and administrative burdens upon WMU. *Matthews v Eldridge*, 424 US 319 (1976)

G. for an award of reasonable costs of litigation, including **attorney fees and costs**, pursuant to 42 USC § 1988 and other applicable law

## JURISDICTION AND VENUE

30. This case arises under the Constitution and laws of the United States and of the State of Michigan. Jurisdiction is conferred on the Honorable Court pursuant to 28 USC § 1331, 28 USC § 1343, 42 USC § 1983, 42 USC § 1985, 42 USC § 1986, 42 USC § 1988, and other Federal and State laws and regulations – to redress violations of federal statutes and state law.

31. This case arises from events that occurred in Eaton County and Kalamazoo County, which is in the Southern District. 28 USC § 102(b).

32. The Honorable Court has subject matter jurisdiction pursuant to Article III of the United States Constitution, 28 USC § 1331 and 28 USC § 1343(a)(1), (2), (3), and (4).

33. Declaratory relief and injunctive relief is authorized pursuant to the Declaratory Judgment Act, 28 USC § 2201 and 28 USC § 2202, by Rule 57 and Rule 65 of the Federal Rules of Civil Procedure, by the All Writs Act, 28 USC § 1651, and by the general legal and equitable powers of this court.

34. The Honorable Court has supplemental jurisdiction regarding state law claims pursuant to 28 USC § 1367 because the state claims arise out of the same nexus of facts and events.

35. Sheridan's claims for damages are authorized pursuant to 42 USC § 1983, 42 USC 2000d-7, and by the general legal and equitable powers of this court.

36. The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

37. Venue is appropriate pursuant to 28 USC § 1391. The individual defendants are residents in the State in which this district is located and a substantial part of the events or omissions giving rise to the claims occurred in this district.

38. Sheridan's claims are timely filed within the applicable statute of limitations.

### PARTIES

39. Sheridan is a citizen of the United States, a citizen of the State of Michigan, and is domiciled in Kalamazoo County, Michigan. Sheridan was a student at WMU and was an academic senior prior to his permanent expulsion from WMU. Sheridan's expected graduation date was May 2022.

40. Defendant, WMU, is a public university, which is located in Kalamazoo, Michigan. WMU is a state entity established and organized under, and pursuant to the laws of the State of Michigan, with the authority to sue and be sued in its own name. WMU receives state and federal grants and funding. At all times relevant, WMU acted and continues to act under color of state law. WMU violated Sheridan's clearly established constitutional rights.

41. Defendant, the Board of Trustees ("Board"), is a public state governmental entity and corporate body organized under, and pursuant to, the laws of the State of Michigan. The Board has the authority to sue and to be sued in its own name. The Board operates within the district. At all times relevant, the Board acted and continues to act under color of state law. The Board violated Sheridan's clearly established constitutional rights.

42. Defendant, Nicole Allbee, is the Director of the Office of Student Conduct at WMU. Allbee has a principle place of business at 1903 West Michigan Avenue, Kalamazoo MI 49008-5326. Allbee is being sued in her individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Allbee was an agent or employee of WMU and acted or failed to act within the scope, course, and authority of her employment. Allbee violated Sheridan's clearly established constitutional rights.

43. Defendant, Diane Anderson, is the Vice President of Student Affairs at WMU. Anderson has a principle place of business at 1903 West Michigan Avenue, Kalamazoo MI 49008-5326. Anderson is being sued in her individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Anderson was an agent or employee of WMU and acted or failed to act within the scope, course,

and authority of her employment. Anderson violated Sheridan's clearly established constitutional rights.

44.     Defendant, Edward Montgomery, is the President of WMU. Montgomery has a principle place of business at 1903 West Michigan Avenue, Kalamazoo MI 49008-5326. Montgomery is being sued in his individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Montgomery was an agent or employee of WMU and acted or failed to act within the scope, course, and authority of his employment. Montgomery is aware of Sheridan's case and took part in the decision making process to impose the permanent expulsion of Sheridan from WMU. Montgomery is responsible for the policies, practices, customs, and procedures of WMU. Montgomery violated Sheridan's clearly established constitutional rights.

45.     WMU and its officials are responsible for creating, adopting, approving, ratifying, and enforcing the policies, practices, customs, and procedures of WMU, including the challenged policies, practices, customs, and procedures of WMU that are the subject of this Complaint.

**<u>BACKGROUND</u>**

46.     At the beginning of the fall semester of 2021, Sheridan was entering his final year as an undergraduate student at WMU. Sheridan was on his way to earning his bachelor's degree as a double major in aviation science and airport management operations. Sheridan had a 3.5 grade point average and was finishing up his bachelors degree in hopes to one day become a commercial airline pilot. Sheridan already had his private pilot license and instrument rating license, commercial single engine land, and commercial multiple engine land. Sheridan was 21 years old. Sheridan had zero criminal

13

history. Sheridan had zero disciplinary history at WMU and zero disciplinary history at any school that Sheridan ever attended. Sheridan had no violent or assaultive history. Sheridan had never been arrested or charged with domestic violence or non-domestic assault and battery. Sheridan had never been arrested or charged with any gun charges or weapons charges. Sheridan had never been arrested or charged with any crime; and Sheridan barely had a speeding ticket to his name. Sheridan had never been investigated for any assaultive conduct or conduct involving any guns or weapons. There had never been a personal protection order filed or entered against Sheridan in the State of Michigan or any other state. Sheridan had never been accused of, or investigated for, any type of stalking or harassment or cyber bullying. Sheridan had no history of abusing drugs or alcohol, and Sheridan was drug tested as part of his pilot training. Sheridan had no mental health history or history of hospitalizations in a mental health facility. Sheridan was a promising young man and student with a bright future.

47.     By December of 2021, WMU sent Sheridan a letter that permanently expelled Sheridan from attending school at WMU, banned Sheridan from all WMU premises, and permanently forfeited all of Sheridan's rights as a student at WMU – for what WMU alleged was a first offense violation of the WMU Student Code. Sheridan would not be able to finish his last three remaining classes at WMU. Sheridan would not be able to graduate and earn a diploma from WMU. Sheridan's dream of becoming a commercial airline pilot would be indefinitely placed on hold and in jeopardy. (Expulsion letters, **Exhibit 1**).

48.     Permanent expulsion from a school comes with a lifetime stigma and precludes Sheridan from educational and employment opportunities.

49. As far as Sheridan and his counsel can gather from the limited information and letters provided by WMU as part of WMU's underlying disciplinary action, WMU permanently expelled Sheridan because of a video that Sheridan made in his private residence in Olivet, Michigan - off-campus from WMU - and that was made from Sheridan's personal cellular phone ("cell phone video") on **November 18, 2021**.

50. Defendants may now assert stalking or harassing behavior as a reason for permanently expelling Sheridan from WMU, but any such allegations are false, frivolous, and not based in fact or law – which law enforcement clearly acknowledges.

51. The only written statement made by WMU regarding the decision to permanently expel Sheridan from WMU comes from the expulsion letters sent to Sheridan from WMU, where WMU asserts the sole reason for permanent expulsion is **"Student Code B.14.b. Harm to persons: Threatening, intimidating, harassing, or coercing any person."** (Expulsion letters from December 13, 2021 and January 28, 2022, **Exhibit 1**).

52. WMU has never provided specifics on any specific individual that Sheridan is alleged to have threatened, intimidated, harassed, or coerced – at least not in writing. But WMU expelled Sheridan by concluding that Sheridan violated **"Student Code B.14.b. Harm to persons: Threatening, intimidating, harassing, or coercing any person."** And there is no basis in fact or law for any false allegations that Sheridan stalked anyone at WMU.

**STATEMENT OF FACTS**

53. There are only 9 individuals, who are not WMU agents or employees, that are involved in this case: (a) Sheridan, (b) Carlee Castle ("Carlee"), (c) Dan Castle ("Dan"),

(d) Jackson Hambright ("Jackson"), (e) Nathan Zona, (f) Samuel Heston, (g) Cam Maurer, (h) Lauren Stephani, and (i) Austin Heinrichs ("Austin").

54. In September 2021, Sheridan attended school at WMU and resided at The Paddock Apartments in Kalamazoo. Sheridan presently resides at The Paddock Apartments in Kalamazoo.

55. In September 2021, Carlee attended school at WMU and resided at The Paddock Apartments in Kalamazoo. Carlee presently resides at The Paddock Apartments in Kalamazoo.

56. In September 2021, Jackson attended school at WMU and resided at The Paddock Apartments in Kalamazoo. Jackson presently resides at The Paddock Apartments in Kalamazoo.

57. In September 2021, Nathan Zona attended school at Kalamazoo College and resided in an off-campus residence in Kalamazoo.

58. In September 2021, Samuel Heston attended school at WMU and resided in an off-campus residence in Kalamazoo.

59. In September 2021, Cam Maurer attended school at WMU and resided in an off-campus residence in Kalamazoo.

60. In September 2021, Lauren Stephani attended school at WMU and resided in an off-campus residence in Kalamazoo.

61. In September 2021, Austin Heinrichs attended school at WMU and resided in an off-campus residence in Kalamazoo.

62. Upon information and belief, Dan is Carlee's father. Sheridan has never seen, met, spoken to, or communicated with Dan in any way. Upon information and belief, Dan

lived in Muskegon, Michigan at all relevant times to the events in this case and continues to live in Muskegon, Michigan.

63. For the fall semester at WMU, Sheridan and Carlee and Austin were all in class together on WMU's campus in a class entitled Business Enterprise 1750. Business Enterprise 1750 met twice per week on Mondays and Wednesdays.

64. Sheridan and Carlee had never met, spoken to one another, or communicated in any way with one another prior to being in the Business Enterprise 1750 together in September 2021.

65. Carlee and Jackson were in a dating relationship and were boyfriend and girlfriend prior to September 2021; but Carlee and Jackson were broken up and not dating each other in September 2021, upon information and belief.

66. Jackson and Austin were friends with one another; and again, Austin was in the same Business Enterprise 1750 class as Carlee and Sheridan in September 2021.

67. While in the Business Enterprise 1750 class, Carlee and Sheridan sat next to one another and were in the same small group for class projects.

68. Carlee and Sheridan struck up a friendship based upon mutual interests, being in the Business Enterprise 1750 class together, being in a small class group together, and living at the same apartment complex.

69. As the class progressed into the fall of 2021, Sheridan and Carlee began to communicate more outside of the Business Enterprise 1750 class; and Sheridan started to develop romantic feelings towards Carlee.

70. Sheridan and Carlee would communicate in a friendly manner with one another in the Business Enterprise 1750.

71. Austin would observe the friendly communication between Sheridan and Carlee, and Austin reported this development to his friend Jackson (Carlee's ex-boyfriend), upon information and belief.

72. In sum, Austin told Jackson that Sheridan was hitting on Jackson's ex-girlfriend Carlee; and Jackson became jealous of this development.

73. Sheridan and Carlee had friendly communication based upon mutual interest in music and would also communicate about class and homework assignments and group projects.

74. Besides in person communication, Sheridan and Carlee would communicate with one another in 3 different ways: (a) Snapchat, (b) text message, and (c) emails.

75. The **email exchanges** between Sheridan and Carlee dealt with the Business Enterprise 1750 class and were not personal in nature. Sheridan does not produce specific email exchanges between himself and Carlee as part of this Complaint, but email exchanges between Sheridan and Carlee were classwork related and were not threatening, harassing, or stalking in nature.

76. The Snapchat messages and text messages between Sheridan and Carlee were both personal and about the Business Enterprise 1750 class.

77. There are two ways in which Snapchat messages can be conveyed: (a) photos, videos, and text messages, which are only saved if a user taps on the message, and (b) messenger messages, which archive and save through the Snapchat application.

78. Sheridan and Carlee communicated with one another through both forms of messages on Snapchat. There is some text message communication that Sheridan has personal recollection about, between himself and Carlee, where Sheridan did not tap on

the message and save the message. But Sheridan has all of the archived messenger messages between himself and Carlee.

79.     Sheridan attaches the full scope of Snapchat messenger communication between himself and Carlee (Snapchat messenger communication 1, **Exhibit 2**); (Snapchat messenger communication 1, **Exhibit 3**).

80.     **Exhibit 2** shows communication from a date range of September 10, 2021 through October 20, 2021.

81.     **Exhibit 2** starts with communication regarding music and class projects. The communication can certainly be construed as flirtatious at times.

82.     Then, on **October 10, 2021**, Carlee sends Sheridan a message that Carlee cannot ride to class together with Sheridan because her ex-boyfriend, Jackson, is a friend with Austin (who is in class together with Sheridan and Carlee); and Austin told Jackson that Carlee and Sheridan talk a lot in class.

83.     According to Carlee, Jackson overreacted to this news, and this created a "messy" situation for Carlee.

84.     Carlee communicated to Austin that Carlee was in a "complicated spot" with Jackson. Carlee communicated that she did not want to make a bad situation with Jackson worse – "even if its something that is not a big deal."

85.     In sum, Carlee's ex-boyfriend Jackson got angry and jealous that Carlee was talking to Sheridan in the Business Enterprise 1750 class.

86.     Sheridan told Carlee that Sheridan understood the situation. Sheridan wrote, "I'm confused now tho I thought we kinda hit it off and was excited to hangout and share our

taste in music, if you're going to pursue your ex then I'll stop asking to hangout just so I don't create any drama I just kinda had the impression that you wanted to hangout."

87.  Carlee responded, in pertinent part, "I'm definitely not pursuing him. I thought we hit it off as well and I do rlly want to hangout. I feel so bad about it bc it's one of those things where I feel like he should just leave it be but lk he won't. Maybe with a little time he will. I'm sorry for confusing you tho, I absolutely want to hangout with you. Just wish my current situation was less complicated. You're also not creating any drama lol. It's 100% not your fault. He's just very immature and I don't want you to have to deal with any of that."

88.  The remainder of **Exhibit 2** is friendly communication between Sheridan and Carlee regarding music and class work. There is also some additional conversation about Carlee and Jackson's relationship with one another. Sheridan also invited Carlee to go flying with Sheridan, and Carlee expressed an interest in going flying with Sheridan. All conversation and communication is friendly between Sheridan and Carlee. Moreover, there is no inappropriate frequency to Sheridan's communication with Carlee.

89.  On October 12, 2021, Sheridan went to Carlee's apartment to take a midterm there. Sheridan and Carlee had friendly interactions, and nothing intimate happened between Sheridan and Carlee. Nothing intimate has ever happened between Sheridan and Carlee. But Sheridan lent Carlee two of his vinyl records while Sheridan was going to be away at a flight team competition – on October 12th.

90.  **Exhibit 3** is Snapchat messenger communication between Sheridan and Carlee from October 20, 2021 through November 25, 2021.

91. The initial communication in **Exhibit 3** is more friendly communication regarding music and class work.

92. On **October 31, 2021**, Sheridan sent the following message to Carlee, "Yo so I know like two weeks ago you said you weren't going to get together with ur ex but then you sent me pictures like two days in a row of ya'll in bed and partying, its cool if y'all are getting back together I respect that I just wish you would have maybe been more upfront with me because like I said I didn't wanna get in the way and be annoying like asking you to hangout all the time. Anyways, what I'm tryna say is I'd rather be friends with you than talk at all plus we see each other in class twice a week and I don't want it to be weird the rest of the semester or for you not to talk to me because I misread the situation with your ex. It would be dope if you were cool with things going back to the way they were about 2 weeks ago when we actually had conversations in class and sent each other songs and stuff. I just don't want the rest of the business class to be awkward Being friends was cooler than whatever this weird no face Snapchat stuff we've got going on rn is."

93. Carlee responded to Sheridan, "Yeah I agree. I definitely enjoy talking but **my ex and I are gonna try and work things out**. I didn't mean to like be rude by sending u all the snaps or anything. But I think being friends is a great idea. Class doesn't need to be awk lol I'm not like that, I'm happy I met you you're a rlly cool person! Definitely good w being friends :)."

94. Sheridan responded that he did not know if he did anything wrong, and Carlee responded, "Nothing to feel bad about! You didn't do anything wrong. I agree good friendship :)."

95. Sheridan responded, "**Also wish you and Jackson the best of luck**, lk I told you how I felt about you so obviously I was trying to make moves as well **but I do genuinely hope y'all work it out**."

96. Carlee responded, "Thank you for understanding :) Appreciate it."

97. Sheridan responded, "Yea no problem just glad we are cool now."

98. From November 1, 2021 through November 15, 2021, Sheridan and Carlee continued to exchange music together and have friendly conversation.

99. Sheridan and Carlee also texted with one another. (Text communication, **Exhibit 4).**

100. **Exhibit 4** starts on October 25, 2021 and ends on November 29, 2021.

101. Almost all of the text communication is regarding class work for Business Enterprise 1750.

102. The text communication between Sheridan and Carlee is also friendly and polite. There is nothing threatening or inappropriate about any of this communication.

103. On Thursday, **November 18, 2021**, Sheridan traveled from Kalamazoo to his childhood home and his parent's residence in Olivet, Michigan, which is approximately 50 minutes away from Kalamazoo.

104. Sheridan was going to Olivet to get a haircut from his local barber and to spend some time at his parent's residence.

105. Sheridan's childhood home and his parent's residence is a farm located on approximately 200 acres of land. Sheridan grew up hunting on the land. There are multiple rifles and handguns on the property – both for hunting and for self-defense. All

rifles and handguns are lawfully registered. None of the rifles or handguns is registered to Sheridan.

106. Sheridan does not own or possess any rifles, handguns, or any other kinds of guns or weapons. And Sheridan has never possessed any rifles, handguns, or any other kinds of weapons in Kalamazoo or anywhere on WMU's campus or premises.

107. Sheridan has communicated with Carlee about where Sheridan grew up and about his farmland and hunting area of his childhood residence – when Sheridan and Carlee were in the Business Enterprise 1750 class together every week on Mondays and Wednesdays.

108. And Carlee knew that Sheridan was going home to Olivet on Thursday, November 18, 2021 – based upon conversation between Sheridan and Carlee in the Business Enterprise 1750 class the day before on Wednesday, **November 17, 2021**.

109. Carlee also told Sheridan that Carlee was going on a hunting trip in the near future with Jackson – during their conversation in class. This was mid to late November in Michigan, which is regular firearm hunting season for deer hunting – a popular pastime in Michigan. And Thanksgiving break was the next week, starting on November 25, 2021.

110. In this context, on **November 18, 2021**, Carlee sent Sheridan a Snapchat text message that asked about whether Sheridan had ever shot a gun before.

111. Sheridan saw the Snapchat text message from Carlee about whether Sheridan had ever shot a gun before. But Sheridan did not tap on the text message to save or screen record this Snapchat text message from Carlee. So Sheridan does not have that text

message to reproduce to the Court, as Snapchat deletes its non-saved text messages under the Snapchat terms and conditions. *Infra*.

112. Sheridan saw the Snapchat text message from Carlee about whether Sheridan had ever shot a gun before – while Sheridan was at his childhood home in Olivet on November 18th. Sheridan knew that there were guns stored in his parent's residence in Olivet.

113. And Sheridan decided to make a cell phone video that featured some guns from his parent's residence.

114. In the fall of 2021, there was a popular trend on the social media platform TikTok called "You're done" videos.

115. TikTok is a social media platform that started in 2016. TikTok "hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to three minutes." As of October 2020, TikTok surpassed over 2 billion mobile downloads. And the American web infrastructure and website security company Cloudfare ranked TikTok as the most popular website of 2021, usurping Google. (https://en.wikipedia.org/wiki/TikTok, last visited March 24, 2022).

116. In September 2021, TikTok user @kittykatkittykatpur posted a video of someone trying to pop a pimple on the side of a young man's head. When the person squeezed too hard, the young man said, "You're done. You're done."

117. The original TikTok video amassed 31.3 million views and spawned over 82,000 related videos. (https://www.intheknow.com/post/youre-done-tiktok/, last visited March 24, 2022).

118. A YouTube compilation of the "You're done" videos can be seen here:

https://www.youtube.com/watch?v=6kcKtck3DeI, last visited March 24, 2022. Different users have creative takes and interpretations of the popular video trend, but Plaintiff's counsel generally describes the videos as silly and jokes – with the phrase "You're done" essentially meaning "stop it" or "stop" in a friendly and playful way. There is generally nothing serious about this popular TikTok trend. The videos are playful in tone. However, this Court could certainly consider the videos uniquely salient to the lives of young college students and part of the "personal intercommunication among the students," which is "an important part of the educational process." *Tinker*, 393 US at 512. Further, some "You're done" videos are a commentary on sexual freedom and body autonomy, which would be political speech. See YouTube compilation; *Supra*.

119. What is clear about the popular "You're done" videos are that they are expressive speech and artistic expression for the individual creators of each video. And they would accordingly be protected speech under the First Amendment. *Infra*.

120. On **November 18, 2021**, while in Olivet, Michigan in his childhood home, Sheridan created his own version of the popular TikTok "You're done" video trend ("cell phone video"). The original cell phone video that Sheridan recorded is attached as **Exhibit 5**.

121. Sheridan then shared the cell phone video to his close group of friends via the social networking application Snapchat.

122. In the fall of 2021, Sheridan and his close group of friends often watched the "You're done" videos and joked around about the "You're done" videos. This included,

but was not limited to: Carlee, Nathan Zona, Samuel Heston, Cam Maurer, and Lauren Stephani.

123. The cell phone video that Sheridan made, and the sharing of the cell phone video, was expressive conduct and protected speech under the First Amendment. *Reno v ACLU*, 521 US 844; 117 S Ct 2329 (1997); *Kaplan v California*, 413 US 115; 93 S Ct 2680 (1973); *James v Meow Media, Inc*, 300 F3d 683 (6th Cir 2002); *Bery v City of New York*, 97 F3d 689 (2nd Cir 1996) ("paintings, photographs, prints and sculptures…always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment Protection."); See *Joseph Burstyn, Inc v Wilson*, 343 US 495 (1952) (holding that motion pictures are a protected form of speech). See *ACLU of Ill. v. Alvarez, 679 F3d 583* (7th Cir 2012), where the Seventh Circuit considered a statute prohibiting audio recording unless all parties to the recording consented. The court observed that "[a]udio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are included within" the First Amendment. *Id* at 595.

124. The cell phone video did not present some grave and imminent threat that the government has the power to prevent. *Near v Minnesota ex rel Olson*, 283 US 697; 51 S Ct 625 (1931).

125. The cell phone video did not constitute fighting words. *Chaplinsky v New Hampshire*, 315 US 568; 62 S Ct 766 (1942).

126. The cell phone video was not speech that was integral to criminal conduct. *Giboney v Empire Storage & Ice Co*, 336 US 490; 69 S Ct 684 (1949).

127. The cell phone video did not constitute defamation. *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710 (1964).

128. The cell phone video did not constitute incitement to imminent lawlessness. *Brandenburg v Ohio*, 395 US 444; 89 S Ct 1827 (1969).

129. The cell phone video did not constitute fraud. *Virginia Bd of Pharmacy v Virginia Citizens Consumer Council, Inc*, 425 US 748; 96 S Ct 1817 (1976).

130. The cell phone video was not child pornography. *New York v Ferber*, 458 US 747; 102 S Ct 3348 (1982).

131. The cell phone video was not vulgar, lewd, indecent, or obscene. *Bethel School District No 403 v Fraser*, 478 US 675; 106 S Ct 3159 (1986); *Miller v California*, 413 US 15; 93 S Ct 2607 (1973).

132. The cell phone video was not part of any school-sponsored activity. *Hazelwood School District v Kuhlmeier*, 484 US 260; 108 S Ct 562 (1988).

133. The cell phone video did not advocate illegal drug use. *Morse v Frederick*, 551 US 593; 127 S Ct 2618 (2007).

134. And the cell phone video was not a "true threat" as defined under state and federal jurisprudence. *Virginia v Black*, 538 US 343; 123 S Ct 1536 (2003); *Watts v United States*, 394 US 705; 89 S Ct 1399 (1969).

135. The cell phone video is 25 seconds long and contains the following words: "oh hey, how's it going…you're done…you're done…you're done bud."

136. The cell phone video features Sheridan holding two guns in his hands throughout the 25 seconds of the video: a Glok 19 Gen 3 pistol and a Smith and Wesson M&P 15 Sport II semi-automatic rifle.

137. The cell phone video starts with Sheridan on camera and standing in a bathroom in his parent's residence. Sheridan is wearing a black t-shirt with "VOLCOM" printed on the front with white lettering. VOLCOM is a skate, surf, snowboarding, and swimwear brand. And Sheridan is wearing gray pants. Sheridan is not wearing any WMU clothing. There are no WMU items or paraphernalia anywhere in the cell phone video, and WMU is never referenced in any way throughout the cell phone video.

138. No person's name is ever stated or referenced in any way through cell phone video. No person is targeted or even mentioned by Sheridan.

139. Approximately 5 seconds into the cell phone video, Sheridan steps out of the bathroom and turns off the bathroom light. At approximately 7 seconds into the cell phone video, Sheridan walks back into the bathroom, turns the light back on, and is facing away from the cell phone camera in profile. Sheridan then turns toward the camera, pulls the Glok 19 Gen 3 pistol out of his waistband, and points the Glok 19 Gen 3 pistol towards the camera as Sheridan is saying "oh hey, how's it going…you're done…you're done…you're done bud."

140. At approximately 14 seconds into the cell phone video, Sheridan takes the clip out of the Glok 19 Gen 3 pistol and places the pistol and the clip on the bathroom countertop. The Glok 19 Gen 3 pistol was never loaded with any bullets during any point of the cell phone video. And the Smith and Wesson M&P 15 Sport II semi-automatic rifle was never loaded with any bullets during any point of the cell phone video.

141. Sheridan then goes out of camera view and picks up the Smith and Wesson M&P 15 Sport II semi-automatic rifle and sort of sneaks out of the bathroom with the rifle

pointed towards the room that was outside of the bathroom. No one else was home in the residence when Sheridan made the cell phone video.

142. Sheridan does not say anything as he is walking out of the bathroom and does not look towards the camera at all. Sheridan's counsel asserts this conduct of walking way is comedic in nature and akin to Elmer Fudd sneaking around with a rifle during rabbit or duck hunting time in old Warner Brothers cartoons.

143. Sheridan then walks back into the bathroom without any gun in his hands, smiling towards the camera, and turns the camera off – ending the cell phone video.

144. The entire 25-second cell phone video is a performance piece, a joke video, and non-threatening in any way.

145. The 25-second cell phone video speaks for itself, but it cannot reasonably and fairly be characterized as menacing or threatening in nature.

146. Again, Sheridan does not name or reference anyone throughout the 25 seconds of the cell phone video.

147. Sheridan does not make any threats on the cell phone video – as the words "you're done" do not constitute a "true threat" under the law nor constitute a threat under a dictionary definition and common sense understanding of the phrase, particularly in context to the popular TikTok trend.

148. The cell phone video was not directed at any recipient and not made for any targeted individual. Again, no one is named during the cell phone video. The only spoken words on the cell phone video are "oh hey, how's it going…you're done…you're done…you're done bud."

149. Sheridan is seen smiling and laughing in a joking manner, not in any menacing manner, at the very end of the cell phone video.

150. The cell phone video was merely what Sheridan believed to be a joke version of a highly popular TikTok video trend in the fall of 2021.

151. On **November 18, 2021**, Sheridan sent out the cell phone video to a small group of close friends via private Snapchat messages, which were sent out simultaneously to the entire group of friends.

152. Sheridan simultaneously sent the cell phone video to Carlee, Nathan Zona, Samuel Heston, Cam Maurer, and Lauren Stephani.

153. It is important to note that Sheridan did not create the video with Carlee as any targeted individual, and Sheridan did not just send the video to Carlee. Sheridan simultaneously sent the video to several of his friends.

154. Carlee received an individual message from Sheridan. And Nathan Zona, Samuel Heston, Cam Maurer, and Lauren Stephani received a group message for a Snapchat group called "The Zoo." But the cell phone video was sent out simultaneously to both Carlee and to "The Zoo" group message. Everyone named above received the cell phone video at the same time.

155. Sheridan regularly socialized with this small group of close friends – as named above. Sheridan regularly communicated with this small group of close friends – as named above. And Sheridan and this small group of close friends joked around together about "You're done" videos on TikTok. So the small group of close friends would have immediately understood the reference to Sheridan saying "oh hey, how's it going…you're done…you're done…you're done bud."

156. Snapchat is a social media application, which allows users to share and edit photos, videos, and messages. Snapchat servers automatically delete group photos, videos, and messages after 24 hours. See When Does Snapchat Delete Snaps and Chats?, Snapchat.com, https://support.snapchat.com/en-US/a/when-are-snaps-chats-deleted (last visited March 24, 2022). Snapchat users can take active steps to save a photo, video, or message at any point. If a user saves a group photo, video, or message, it remains available to all members of the Snapchat group. Further, Snapchat users are notified when another user saves or screen records a video. [After saving a Snap, the Snap will appear in the chat as Chat Media; *Id*.]

157. No one that Sheridan sent the cell phone video to on November 18, 2021 saved or screen-recorded the cell phone video through the Snapchat application.

158. It has later been revealed that Carlee made a recording of Sheridan's cell phone video, by pointing another phone at her phone and recording Sheridan's cell phone video with the other phone. It is unclear whose phone recorded the cell phone video, but Sheridan asserts that it was Jackson's phone – as Carlee was likely with Jackson when she received the Snapchat message and video from Sheridan. In the recording that Carlee made of Sheridan's cell phone video, Carlee is heard talking to someone else, which is likely Jackson. But no recipient of Sheridan's cell phone video screen-recorded Sheridan's cell phone video through the Snapchat application – because Sheridan would have been notified through Snapchat had that happened.

159. Sheridan received friendly responses from the people in the small group of close friends who received the cell phone video from Sheridan and who responded to the Snapchat messages that were sent out simultaneously to the small group of close friends.

No one in the small group of close friends expressed any concern to Sheridan about the cell phone video.

160. And Carlee sent Sheridan a text message on Snapchat that said "what was that :)." The smiley face emoji at the end of the message is consistent with a person that is not concerned about the cell phone video or threatened by the cell phone video in any way.

161. For approximately 8 days, from **November 18, 2021** through **November 26, 2021**, no one did anything in response to this cell phone video, upon information and belief. No one called or notified the police. No one called or notified WMU.

162. Sheridan communicated regularly with the small group of close friends that received a copy of the cell phone video via Snapchat.

163. Further, Sheridan sent Carlee a Snapchat messenger message on Friday, November 19, 2021 with a photograph of Carlee in Carhartt-type bibs and hunting clothing with a caption that said "Country girl shit." **Exhibit 3**.

164. Carlee responded to Sheridan's Snapchat messenger message with "Word," which is slang for acknowledgment, approval, recognition, or affirmation of something that someone else just said. **Exhibit 3**.

165. Carlee certainly never expressed any concern towards Sheridan; and Carlee responded to Sheridan's **November 19th** communication in a normal manner and consistent with the way that Carlee normally responded to Sheridan's communication.

166. Sheridan also sent Carlee Snapchat messenger messages with photographs of an alcoholic drink and then a music recommendation on **November 20, 2021** and **November 25, 2021**. Carlee did not respond to these messages on Snapchat messenger,

32

but there was no concern expressed by Carlee or anyone else regarding these two messages.

167. Then, on Thursday, **November 25, 2021**, which was Thanksgiving Day, Carlee sent Sheridan a Happy Thanksgiving message via text message on Snapchat. Sheridan did not save this Snapchat text message.

168. WMU students mostly travel home for the Thanksgiving holiday, which was **November 24, 2021 through November 29, 2021**.

169. Upon information and belief, Carlee traveled to be with her family over the Thanksgiving holiday – and she may have also been with her boyfriend Jackson.

170. Upon a Freedom of Information Act (FOIA) request from Sheridan's counsel, Sheridan's counsel has obtained a WMU Public Safety Incident Report, as well as the body worn camera footage and in car video footage from the police officials that are involved in this matter.

171. Throughout the disciplinary proceeding between WMU and Sheridan, WMU never provided Sheridan with a written copy of this Incident Report. And Sheridan has subsequently learned that WMU and its agent (**Dr. Allbee**) withheld all portions of the Incident Report that referenced the name of Dan Castle as the accuser, when WMU showed Sheridan the Incident Report on a computer screen during the WebEx meeting on December 6, 2021. Sheridan asked Dr. Allbee for the name of his accuser, and Dr. Allbee refused to provide that information to Sheridan – even though Dr. Allbee clearly knew the identity of Sheridan's accuser.

172. The WMU Public Safety Incident indicates that on **Friday, November 26, 2021**, Dan Castle ("Dan") called and made a police report about the cell phone video.

33

173. Again, Dan is Carlee's father. And Carlee went to visit with her family over the Thanksgiving break, upon information and belief.

174. It is unclear when or in what context, but Carlee must have shown Dan the recording that Carlee made of Sheridan's cell phone video - at some point in time over the Thanksgiving holiday.

175. Again, Sheridan does not know Dan Castle. Sheridan has never met Dan Castle. Sheridan has never spoken to Dan Castle. Sheridan has never communicated with Dan Castle in any way. And Sheridan has never received any communication from Dan Castle or anyone on Dan Castle's behalf.

176. The first time Sheridan has ever heard of Dan Castle is through receiving a copy of the WMU Incident Report as a result of Sheridan's counsel's FOIA request to WMU.

177. Upon information and belief, Dan Castle resides in Muskegon, Michigan – approximately one hour and thirty minutes away from Kalamazoo, Michigan.

178. The Incident Report is short. The Incident Report states, in pertinent part, "WMUPD received a call from a concerned parent who's daughter had received Snapchat video messages from HEDRICK where he displayed firearms and in one instance, indicated "If I brought these to campus." I was forwarded a video via email where Hedrick displays firearms and points one at the camera. The second, where he speaks, was not saved by the reporting party. The initial concern came from a current student who had a class with HEDRICK and when he became romantically interested, the student had to turn him down. After, HEDRICK began taking pictures of the student's roommates and the student thought he may be following her around because he would

34

message her that he saw her and her boyfriend out places, but the student never saw Hedrick when she was out." (Incident Report, **Exhibit 6**).

179. Again, Dr. Allbee removed, redacted, or withheld the information about Sheridan's accuser from Sheridan during the WebEx meeting on December 6, 2021. But the Incident Report clearly describes Sheridan's accuser.

180. Sheridan affirmatively states that there was only one cell phone video that he ever made, and that is the 25-second cell phone video that is attached as **Exhibit 5**. There is no second cell phone video.

181. Sheridan never said anything about "if I brought these to campus." That is totally false. That never happened.

182. Further, Sheridan never took any photographs of Carlee, Jackson, Carlee's roommates, or anyone associated with Carlee. That is totally false. That never happened.

183. Further, Sheridan never followed Carlee or Jackson or engaged in any stalking or harassing behavior toward Carlee or Jackson or anyone associated with Carlee and Jackson. That is totally false. That never happened.

184. Further, while it is true that Sheridan expressed a romantic interest in Carlee, Carlee informed Sheridan that Carlee was getting back together with her old boyfriend; when Carlee Castle told Sheridan about getting back together with her old boyfriend, Sheridan accepted this and wished them both the best. This is all reflected in **Exhibit 3**.

185. Officer Johnson, with WMU Public Safety, filled out a "student concern form" with WMU – simply relaying the information that Dan said to Officer Johnson – without any further investigation.

186.    And WMU never investigated or even attempted to communicate with Carlee, Jackson, Carlee's roommates, or anyone else associated with the false allegations against Sheridan – upon information and belief.

187.    Officer Johnson's Incident Report says, "I did not speak to the student at all. She did not want to speak with me at the time of this report." And Officer Johnson did not do any additional investigation.

188.    Sheridan and all WMU students returned from holiday break on November 29, 2021.

189.    On **November 29, 2021**, an employee from WMU called Sheridan on the telephone and informed Sheridan that an unidentified individual submitted a student concern form to WMU. Of course, the WMU employee was lying and withholding information from Sheridan – as Dan Castle called in the complaint to WMU Public Safety and Officer Johnson submitted the "student concern" form.

190.    Sheridan advised this employee from WMU that Sheridan was not a threat to himself or others. And no further investigation was made regarding Sheridan's mental state of mind.

191.    Sheridan returned to school and classes starting on November 29, 2021. WMU neither banned Sheridan from WMU's campus and premises nor issued any interim orders regarding Sheridan – which is consistent with WMU not believing that Sheridan's presence posed a continuing danger to persons or property or was an ongoing threat of disrupting the academic process. *Goss v Lopez*, 419 US 565 (1975).

192.    On the morning of **November 30, 2021**, Detective Tom Rossiter and uniformed officer Patrick Wujkowski, from WMU Public Safety, interviewed Sheridan. The officers

36

first went to Sheridan's apartment and spoke to his roommate, who informed the officers that Sheridan was at work at Tropical Smoothie. This audio recording was turned over as part of the FOIA request and is attached as **Exhibit 7**.

193. The officers then returned to their patrol vehicle and drove directly to Tropical Smoothie on West Main Street in Kalamazoo. The in car audio and video from this car ride is attached as **Exhibit 8**.

194. The police interview with Sheridan was unannounced and unexpected to Sheridan. The interview was video and audio recorded with body worn camera from officer Patrick Wujkowski, which is attached as **Exhibit 9**.

195. Sheridan is clearly surprised and nervous about talking to the police and having two police officers meet him at work.

196. However, Sheridan did voluntarily cooperate and politely answered all questions from the officers.

197. Sheridan told the officers that he sent the cell phone video to one person, Carlee. Sheridan said "one person that I can remember." In the heat of being nervous and talking to two officers, Sheridan gave this inaccurate information. Sheridan actually sent the cell phone video simultaneously to Carlee, Nathan Zona, Samuel Heston, Cam Maurer, and Lauren Stephani – as described above. (Affidavits of Samuel Heston, Cam Maurer, and Lauren Stephani, **Exhibit 10**).

198. Sheridan informed the officers that Sheridan thought the cell phone video was funny and that Sheridan did not mean any harm by the cell phone video. Sheridan advised the officers that the cell phone video was made from his family farm in Olivet, Michigan, and the guns in the video were for hunting and self-defense. Sheridan advised the officers

that he does not have any guns in Kalamazoo. Sheridan advised the officers that he did not have any interest in harming himself or others.

199. Sheridan immediately informed the officers about Carlee's response where Carlee said "what was that :)."

200. The officers also asked Sheridan about an allegation of Sheridan engaging in stalking behavior; but the police reported to Sheridan that this allegation was from a third hand source.

201. Sheridan strongly denied ever engaging in stalking behavior and explained to the officers that himself and Carlee have a class together on Mondays and Wednesdays and are in the same group together and sit together in the class. Sheridan explained that himself and Carlee both live at the same apartment complex.

202. Detective Rossiter tells Sheridan, "we are getting this all third hand, and that's why I wanted to make contact with you, because third hand isn't great information, right."

203. Sheridan denied ever monitoring or engaging in any stalking behavior with Jackson, Carlee's once ex-boyfriend and then boyfriend. But Sheridan explained that himself, Carlee, and Jackson all lived in the same apartment complex.

204. Detective Rossiter confirmed to Sheridan that no one from his department has talked to Carlee at all and that they just got third hand information. Detective Rossiter says to Sheridan, "we don't know how [Carlee] feels or anything else regarding this."

205. Detective Rossiter asked Sheridan about making a statement regarding taking guns to campus.

206. Sheridan immediately and strongly denied that he ever said anything about taking guns to campus: "I did not say that. I did not say that."

207. The Court can review the body worn camera footage from **Exhibit 9** and make a credibility determination regarding Sheridan.

208. Officer Wujkowski tells Sheridan that Sheridan is not under investigation for anything and encourages Sheridan to tell WMU that Sheridan is fine and not a threat to himself or others.

209. Sheridan asked who made the police report to WMU Public Safety, and Detective Rossiter told Sheridan that it was "anonymous." This was a known lie from Detective Rossiter, as Dan Castle made the report. So WMU Public Safety refused to identify who called them to Sheridan.

210. Sheridan again strongly denied engaging in any stalking type behavior with Carlee, Jackson, and anyone associated with Carlee.

211. Sheridan told the officers his schedule: on campus on Mondays and Wednesdays, at work, or out flying for his aviation training. Sheridan has never stalked Carlee, Carlee's roommates, or anyone associated with Carlee.

212. In Sheridan's counsel's opinion, the officers clearly found Sheridan to be credible; and the Incident Report is listed as "Closed" with no follow up and no request for any charges to any prosecuting official.

213. Sheridan again affirmed to Officer Wujkowski that Sheridan did not want to harm himself or anyone else and that all guns are in Olivet, Michigan.

214. Detective Rossiter again told Sheridan, "[Carlee] did not make the report and she didn't want anything to do with us."

215.     Detective Rossiter further stated, "the officer tried to talk to [Carlee], and basically she didn't want to talk to him." Detective Rossiter informed Sheridan that this attempted police contact with Carlee occurred on or about November 26, 2021.

216.     It is known that WMU Public Safety did no other investigation or attempts to speak with anyone named in the Incident Report. It is believed that no one from WMU Student Conduct ever talked to, communicated with, or attempted to even reach out to Carlee, Jackson, or anyone associated with Carlee – despite stalking allegations against Sheridan.

217.     The officers then both shook Sheridan's hand and left Tropical Smoothie.

218.     The officers walked back into their patrol car, and the audio picks up Detective Rossiter saying something about the interview and the stalking question that Detective Rossiter asked to Sheridan. But WMU edited and cut off the in car video at this point in time with the FOIA materials that were given to Sheridan's counsel, so it is unclear what Detective Rossiter says during this moment. See **Exhibit 8**.

219.     Sheridan and his counsel are not ignorant to the knowledge that the Oxford High School shooting occurred in the early afternoon of **November 30, 2021**, where four high school students were killed and seven people were injured, including a teacher. But Sheridan made his cell phone video and sent the cell phone video out on **November 18, 2021** - nearly two weeks prior to November 30, 2021. WMU cannot punish Sheridan based upon community fear for an event that occurred nearly two weeks after the conduct in question from Sheridan.

220. After the police interview, Sheridan understood that the police were not recommending any criminal charges be issued against Sheridan. And Sheridan has never been charged with any crime related to the cell phone video or anything else.

221. Sheridan returned to his classes and was present on the WMU campus.

222. Again, WMU did not enter any immediate and interim orders for Sheridan not to be present on WMU's premises or for Sheridan to have no contact with Carlee, Jackson, or anyone associated with Carlee and Jackson. That never happened, and Sheridan was on WMU's campus for his classes throughout the disciplinary process.

223. On **December 1, 2021**, Sheridan received an email from the WMU Office of Student Conduct to set up a meeting with Dr. Nicole Allbee.

224. The December 1st email from Dr. Allbee did not contain any substantive information. The December 1st email was simply an invitation to join a WebEx meeting Dr. Allbee from the WMU Office of Student Conduct.

225. Sheridan was not advised, in writing or otherwise, about any allegations of misconduct against him, despite the directive and contract language from the **WMU Student Code**:

> Any formal charge(s) that result from information brought to the Office of Student Conduct shall be presented to the respondent **in written form** by a conduct body. Cases that are likely to result in suspension or expulsion shall be heard no sooner than 24 hours after notice to the student. All other cases shall be dealt with in a more informal manner and may be heard simultaneously with notice. (Emphasis added)

226. WMU did not use its discretion to conduct any independent investigation into any allegations against Sheridan or seek mutual consent from any party involved with any

allegations against Sheridan, despite the directive and contract language from the **WMU Student Code**:

> The appropriate staff in the Office of Student Conduct may conduct an investigation to determine if the information has merit and/or if the situation can be resolved administratively by mutual consent of the parties involved on a basis acceptable to the appropriate staff in the Office of Student Conduct.

227. In receiving the December 1st email from Dr. Allbee, Sheridan had no idea and no notice from WMU about: (a) what Sheridan was being accused of or investigated for, and (b) what section of the WMU Student Code that Sheridan was being accused of violating.

228. Sheridan was never given any opportunity to respond to any formal written charges or orally stated charges – to admit or deny the allegations against him. And that is because neither WMU nor its agents ever presented Sheridan with any charges against himself.

229. The December 1st email did not contain any attached emails, text messages, social media messages, photographs, videos, or any other form of written or electronic communication, information, documents, reports, or records, of any kind, in any format, in support of any allegations against Sheridan.

230. The December 1st email did not contain any preliminary investigation report. There was no executive summary. There was no bullet point synopsis of any allegations against Sheridan.

231. The December 1st email did not contain any witness statements of any kind in support of any allegations against Sheridan.

232.    The December 1st email did not identify any witnesses against Sheridan for any allegations against Sheridan. And the December 1st email did not identify who was accusing Sheridan of any misconduct.

233.    The December 1st email did not advise Sheridan of any rights: to confront and cross examine witnesses; to an attorney or advisor or support person; to have a hearing conducted by a conduct body; to remain silent and to choose not to participate in the meeting at all.

234.    The December 1st email failed to provide any notice of the alleged offense and failed to present Sheridan with any opportunity to respond.

235.    The December 1st email failed to explain or provide details for why WMU had jurisdiction to even conduct any disciplinary process against Sheridan, as the cell phone video was made from a private cell phone, off-campus, and not involving any school sponsored event or activity in any way. And there was nothing but vague, false, third-hand allegations that Sheridan engaged in some sort of stalking or harassing behavior, without any specificity of when or where this was supposed to have occurred – and with no indication that any of these false allegations against Sheridan took place on campus or involving a school sponsored event or activity.

236.    Per the WMU Student Code and contractual language:

> Generally, the Student Code shall apply to conduct which occurs on University premises and at University sponsored activities. The University may take action in off-campus situations involving flagrant disregard for any person or persons; or when a student's or student organization's behavior is judged to threaten the health, safety, and/or property of any individual or group; or any other activity which adversely affects the University community and/or the pursuit of its objectives. The appropriate staff in the Office of Student Conduct/or designee, shall decide, on a case by case basis, whether the Student Code shall be applied to conduct occurring off-campus.

237. The December 1st email, nor any subsequent written communication from WMU, failed to explain any allegation that would constitute a "flagrant disregard for any person or persons" or behavior that is "judged to threaten the health, safety, and/or property of an individual or group."

238. The December 1st email failed to inform Sheridan that he could face discipline for failing to comply with the direction of a University official and for failure to attend an appointment when directed to do so by a University official. See page 14 of the WMU Student Code under Section 8. Failure to Comply and Section 12. Conduct system abuse. (WMU Student Code, **Exhibit 11**).

239. Sheridan did attend a meeting via two-way interactive video technology, and the WebEx platform, with Dr. Allbee on **December 2, 2021**.

240. Sheridan did not have legal representation for this meeting with Dr. Allbee. When Sheridan asked about legal counsel, Dr. Allbee told him that legal counsel would not be able to speak at any hearing.

241. The contractual language of the WMU Student Code, Article V. Conduct Hearings states, in pertinent part:

> f. The complainant and the respondent may be assisted by one support person of their own choosing and at their own expense. **Support persons are not permitted to speak or to participate directly in any hearing before a conduct body**. All communications related to the case (before, during and after a hearing) shall be directed to the respondent and not to any support person. (Emphasis added)

242. This provision is unlawful and inconsistent with federal law in *Doe v Baum*, which states, in pertinent part:

> Thirteen years ago, this court suggested that cross-examination may be required in school disciplinary proceedings where the case hinged on a question of credibility. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005). Just

last year, we encountered the credibility contest that we contemplated in *Flaim* and confirmed that when credibility is at issue, the Due Process Clause mandates that a university provide accused students a hearing with the opportunity to conduct cross-examination. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401–02 (6th Cir. 2017). Today, we reiterate that holding once again: if a public university has to choose between competing narratives to resolve a case, the university must give the accused student ***or his agent*** an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder. Because the University of Michigan failed to comply with this rule, we reverse. (Emphasis added)

243. *Baum* is clear that the accused student, or his agent, must be afforded an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder. WMU's policy is incompatible with federal law, violates Sheridan's and others' due process rights, and must be remedied by this Court.

244. Moreover, the contractual language of Article V, Section f, states,

f. Pertinent records, exhibits and written statements may be accepted as evidence for consideration by a conduct body at the sole discretion of the appropriate staff within the Office of Student Conduct/or designee.

245. Sheridan's counsel has participated in other disciplinary proceedings at WMU, has placed WMU on actual notice of its unlawful practices, and has been silenced at any conduct hearings that take place at WMU. But Sheridan's counsel has also provided briefing and exhibits and written arguments to disciplinary hearings, and Dr. Allbee never explained to Sheridan that he or any agent/attorney could submit such written briefs and exhibits prior to any hearing. Instead, Dr. Allbee discouraged Sheridan from retaining legal counsel – through her statements and her omissions to Sheridan.

246. In the meeting on December 2nd, Sheridan denied engaging in any threatening behavior. Sheridan told Dr. Allbee that the cell phone video was a joke and based off of the popular TikTok trend for "You're done" videos.

247. At the meeting on December 2nd, Dr. Allbee did not show Sheridan the Incident Report.

248. To the extent that Dr. Allbee communicated to Sheridan that Sheridan was being accused of stalking behavior at this meeting on December 2nd, Sheridan denied all allegations of stalking behavior to Dr. Allbee.

249. And Dr. Allbee specifically told Sheridan that allegations of stalking behavior would not be discussed at Sheridan's disciplinary hearing.

250. At the meeting on December 2nd, Dr. Allbee played Sheridan a portion of the recording of Sheridan's cell phone video, which Sheridan now knows that Carlee took. Dr. Allbee did not identify who provided the recording of Sheridan's cell recording to WMU or who recorded Sheridan's cell phone video. But Dr. Allbee played Sheridan a portion of this recording of Sheridan's cell phone video.

251. On the recording of Sheridan's cell phone video, Carlee is heard saying what sounds like, "this is the business boy that's been stalking me." Carlee is heard laughing as she says these words. Sheridan suspects that Carlee was sitting next to Jackson and using Jackson's phone to record Sheridan's cell phone video.

252. Dr. Allbee did not play the portion of the recording where Carlee's voice is heard. Dr. Allbee purposely withheld that portion of the recording from Sheridan on December 2, 2021. And Dr. Allbee specifically told Sheridan that Sheridan's disciplinary hearing was not about stalking allegations. Then, during Sheridan's actual disciplinary hearing, Dr. Allbee ambushed Sheridan and played the entire recording of Sheridan's cell phone video, where Carlee says, "this is the business boy that's been stalking me." This prompted questions from panel members at Sheridan's disciplinary hearing, which

Sheridan was not prepared to answer and was taken aback by, given Dr. Allbees' assertion to Sheridan that the disciplinary hearing was not about stalking allegations.

253. In Sheridan's case, credibility is clearly at issue. And this triggers Sheridan's right to compel witnesses and allow for cross-examination of witnesses by Sheridan and/or his agent/attorney. None of this occurred in Sheridan's case. WMU never compelled any witnesses to appear at Sheridan's disciplinary hearing, despite its authority to do so through the WMU Student Code. *Supra*.

254. It is unclear whether Dr. Allbee ever showed Sheridan a document entitled "Conduct Process Form" on December 2nd. But Sheridan never signed any document at the WebEx meeting with Dr. Allbee on December 2nd.

255. Dr. Allbee simply gave Sheridan some verbal information regarding allegations against Sheridan.

256. The December 2nd meeting ended, and Sheridan continued attending classes and living at his apartment complex with Carlee and Jackson, without any interim orders put into place by WMU.

257. Sheridan then received another email from Dr. Allbee with a WebEx invitation for **December 6, 2021**. This email did not contain any substantive information, no attachments, and no records or documents of any kind. It was simply a WebEx invitation.

258. Sheridan attended the WebEx meeting with Dr. Allbee on **December 6, 2021**.

259. During the meeting, Dr. Allbee showed Sheridan a portion of the WMU Incident Report for this case, without reference to Sheridan's accuser and the reporting party in Dan Castle.

260. But Sheridan was never provided with a copy of the Incident Report. And WMU never identified and informed Sheridan of the identify of the accuser for the allegations against Sheridan, despite Sheridan's request for the identity of his accuser.

261. WMU failed to provide Sheridan with a written copy of the Incident Report. Throughout the disciplinary process with Sheridan, WMU never provided Sheridan with any written reports of any kind.

262. WMU's policy of failing to provide written documents with the accusations against an accused student is inconsistent with federal law and due process. This Court must intervene and remedy WMU's unlawful policies, practices, and customs.

263. The December 6th WebEx meeting ended, and Sheridan continued his classwork, continued to be on campus at WMU, and continued living and working in Kalamazoo.

264. Sheridan's disciplinary hearing was scheduled for **December 9, 2021**.

265. And Sheridan's disciplinary hearing took place with agents of WMU on December 9, 2021 – via WebEx. Sheridan's current counsel did not attend this hearing, nor did any other legal counsel; and Sheridan did not hand-write notes with the names and identities of participants of the panel for the disciplinary hearing. WMU's failure to provide written notification of who is adjudicating a student's case is another change that needs to be compelled moving forward. Dr. Allbee was one of the participants at the disciplinary hearing, despite her role as the investigator in this case.

266. WMU did not compel any witnesses to attend Sheridan's disciplinary hearing. And WMU did not present any witnesses at Sheridan's disciplinary hearing.

267. WMU had the power and authority to compel the attendance of Carlee, Jackson, and any of Carlee's roommates that were WMU students to Sheridan's disciplinary

hearing – under the WMU Student Code. WMU failed to compel the attendance of anyone, despite the fact that Sheridan denied engaging in any threatening, stalking, or harassing behavior.

268. WMU therefore failed to provide Sheridan with the right to cross-examine witnesses where WMU's determination turns on the credibility of any accuser, the accused, or other witnesses. *Doe v Baum*; *Supra*.

269. Sheridan presented Nate Zona, Samuel Heston, Cam Maurer, and Lauren Stephani as Sheridan's witnesses. All of Sheridan's witnesses testified that Sheridan's cell phone video was a joke video, not taken seriously, and not taken as a threat. WMU has not produced any written or verbal information or evidence to impugn the credibility of any of Sheridan's witnesses.

270. Sheridan was advised that he could not record his own disciplinary hearing, but WMU recorded the disciplinary hearing, upon information and belief.

271. Sheridan also testified himself, where Sheridan testified credibly to the panel that the cell phone video was a joke, was not intended for any targeted recipient, and was not a threat of any kind. Sheridan also denied engaging in stalking or harassing behavior. WMU has not produced any written or verbal information or evidence to impugn the credibility of Sheridan.

272. Sheridan did not produce any exhibits or written statements, as Sheridan did not realize that he could do so at this hearing. Sheridan is not an attorney, and Sheridan's disciplinary process all occurred very quickly and at the end of a semester, which is the busiest time of the semester – as Sheridan and all students are preparing for final examinations.

273. The hearing ended, and Sheridan continued to attend classes at WMU and take his final examinations.

274. On **December 13, 2021**, Sheridan had another WebEx meeting with Dr. Allbee. Dr. Allbee verbally informed of his permanent expulsion from WMU; and WMU emailed Sheridan a letter with the sanctions. See **Exhibit 1**.

275. Sheridan exhausted his administrative remedies by appealing his permanent expulsion – with different legal counsel. WMU did not send out any written response to Sheridan's appeal.

276. On **January 28, 2022**, Sheridan received the second letter from WMU, which upheld the sanctions and continued Sheridan's permanent expulsion from WMU. **Exhibit 1**.

277. On **March 24, 2022**, Sheridan's current counsel wrote to Jessica Swartz, General Counsel for WMU. Sheridan's counsel sought Sheridan's immediate reinstatement to WMU. Sheridan's counsel sought concurrence in the relief requested in this Complaint.

278. On **March 25, 2022**, attorney Swartz emailed Sheridan's counsel and denied the request and indicated that WMU would oppose any motion for such requested relief. (Correspondence, **Exhibit 12).**

**Count I: First Amendment Violation (Against All Defendants)**

**(First Amendment; Article I. Section 5 of Michigan Const; 42 USC § 1983)**

279. Sheridan re-alleges and incorporates by reference paragraphs 1 through 278 of this Complaint.

280. The First Amendment to the United States Constitution protects Sheridan's off-campus speech.

281.    And Article I, Section 5 of the Michigan Constitution of 1963 protects Sheridan's off-campus speech.

282.    While WMU may not have found Sheridan's cell phone video to be a joke and to be funny, Sheridan's cell phone video was not a true threat as defined by state and federal law, particularly when considered in the context of Sheridan's cell phone video being Sheridan's version of a popular TikTok trend from fall 2021 that was openly known to every recipient of Sheridan's cell phone video.

283.    Further, the individual who reported concern about Sheridan's cell phone video, Dan Castle, was not an intended recipient of the cell phone video. And Sheridan cannot be punished because Sheridan overlooked the possibility that Carlee Castle would show her father, Dan Castle, Sheridan's cell phone video.

284.    Sheridan's cell phone video was not reasonably calculated to reach the school environment at WMU. And Sheridan's cell phone video did not pose any serious safety risk to WMU.

285.    WMU's students, including Carlee and Jackson, did not face any disruption or disorder as a result of Sheridan's cell phone video.

286.    WMU's staff and agents did not face any disruption or disorder as a result of Sheridan's cell phone video.

287.    And there are no demonstrable factors that would give rise to any reasonable forecast of any substantial and material disruption to WMU students and staff.

288.    Defendants did not have any constitutionally justified reason, nor any legal authority, to discipline Sheridan for Sheridan's cell phone video, which was private, non-school related, non-threatening speech that was produced and communicated off-campus.

289. Defendants are "persons" under 42 USC § 1983.

290. Further, if the Court analyzes this case under secondary school precedent, after *Mahanoy Area School District v BL*, the law is sufficiently clear, every reasonable official understands, and the constitutional question is beyond debate, regarding regulation of off-campus student speech such as Sheridan's cell phone video. Defendants are not entitled to qualified immunity. *Kisela v Hughs,* 548 US ___; 138 S Ct 1148 (2018).

291. Schools maintain a license to regulate off-campus speech for cases of "serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers."

292. But Sheridan's cell phone video was not a threat aimed at any student or teacher, as defined by state and federal law. And *Mahanoy* makes clear that: (a) schools will rarely stand *in loco parentis*, and thus off-campus speech "will normally fall within the zone of parental, rather than school-related responsibility, (b) because regulation of off-campus speech would, potentially, cover all speech in a twenty-four-hour period, "court must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all," and (c) schools, themselves, have "an interest in protecting a student's unpopular expression, especially when the expression takes place off campus."

293. Moreover, it is well-recognized that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas[,]'" *Healy*, 408 US at 180; *Supra*, and

"[t]he First Amendment guarantees wide freedom in matters of adult public discourse." *Fraser*, 478 US at 682; *Supra*.

294. And public college and university administrators are granted less leeway to restrict speech than public elementary and secondary school administrators. *Sypniewski v Warren Hills Reg'l Bd of Educ*, 307 F3d 243 (3d Cir 2002); *DeJohn v Temple Univ*, 537 F 3d 301 (3d Cir 2008) ["Discussion by adult students in a college classroom should not be restricted," *Id* at 315, based solely on rationales propounded specifically for the restriction of speech in public elementary and high schools, see *Id* Cf *Sypniewski*, 307 F.3d at 260"]

295. In this case, WMU intentionally, without legal authority, and under color of state law, violated Sheridan's clearly established rights by illegally punishing and permanently expelling Sheridan for Sheridan's protected speech. WMU violated Sheridan's clearly established rights in violation of 42 USC § 1983.

296. Defendants acted with reckless, wanton, or callous indifference to Sheridan's protected constitutional rights.

297. Defendants violated Sheridan's clearly established rights by permanently expelling Sheridan because of Sheridan's speech in Sheridan's cell phone video.

298. Sheridan is entitled to compensatory damages for Defendants' violation of Sheridan's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

299. Sheridan is entitled to punitive damages for Defendants' reckless or callous indifference to Sheridan's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

300. Sheridan is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

301. Sheridan is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Sheridan's First Amendment rights.

302. Sheridan is entitled to immediate reinstatement to WMU, to resume all school activities, and to complete his diploma at WMU.

303. Sheridan is entitled to an expungment of his record and the removal of any reference to an expulsion from WMU from Sheridan's transcript and permanent record.

**Count II: First Amendment Retaliation (Against All Defendants)**

**(First Amendment; 42 USC § 1983)**

304. Sheridan re-alleges and incorporates by reference paragraphs 1 through 303 of this Complaint.

305. Sheridan was engaged in constitutionally protected activity through the making Sheridan's cell phone video and through sending Sheridan's cell phone video to a small group of close friends.

306. Defendants' act of permanently expelling Sheridan from WMU would deter or chill a person of ordinary firmness from continuing to engage in constitutionally protected activity such as making one's own version of a popular TikTok trend in making a "You're Done" video, even a version that depicted guns or firearms in any way.

307. Further, Defendants' decision to permanently expel was motivated primarily by Sheridan's creation and sending of Sheridan's cell phone video, which is constitutionally protected activity.

308. Accordingly, Defendants have engaged in First Amendment retaliation against Sheridan and are liable to Sheridan.

309. In engaging in First Amendment retaliation against Sheridan, Defendants acted with reckless, wanton, or callous indifference to Sheridan's protected constitutional rights.

310. Defendants violated Sheridan's clearly established rights by permanently expelling Sheridan because of Sheridan's speech in Sheridan's cell phone video.

311. Sheridan is entitled to compensatory damages for Defendants' violation of Sheridan's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

312. Sheridan is entitled to punitive damages for Defendants' reckless or callous indifference to Sheridan's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

313. Sheridan is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

314. Sheridan is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Sheridan's First Amendment rights.

315. Sheridan is entitled to immediate reinstatement to WMU, to resume all school activities, and to complete his diploma at WMU.

316. Sheridan is entitled to an expungment of his record and the removal of any reference to an expulsion from WMU from Sheridan's transcript and permanent record.

**Count III: *Monell* liability (Against All Defendants)**

**(First Amendment; 42 USC § 1983)**

317. Sheridan re-alleges and incorporates by reference paragraphs 1 through 316 of this Complaint.

318. A local government entity may not be sued under 42 USC § 1983 on a respondeat superior theory of liability. But a local government entity may be subject to §1983 liability for inadequate training of its employees that directly causes constitutional injury. *City of Canton v Harris*, 489 US 378; 109 S Ct 1197 (1989); *Monell v New York Dep't Soc Servs*, 436 US 658; 98 S Ct 2018 (1978).

319. Further, §1983 claims for failure to train employees requires proof that: (a) the training practices were inadequate, (b) the local government entity was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by the local government entity, and (c) the alleged deficiency in the training procedures actually caused the plaintiff's injury. *City of Canton*; *Id*.

320. Plaintiffs must also prove that "the need for more of different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [local government entity] can reasonably be said to have been deliberately indifferent to the need." *Id*.

321. In this case, Defendants' policies and procedures, which led to the decision to permanently expel Sheridan, are in direct conflict with Sheridan's First Amendment rights and are a custom, pattern, and practice of the Defendants – in violation of 42 USC § 1983.

322. Defendants Allbee, Anderson, and Montgomery all failed to know and understand First Amendment law and precedent regarding off-campus student speech and the how that impacted the decision to permanently expel Sheridan for Sheridan's cell phone video.

323. Further, Defendants Allbee, Anderson, and Montgomery all failed to investigate the facts of this case to understand the context of Sheridan's cell phone video and failed to provide Sheridan with appropriate due process throughout the disciplinary process.

324. Defendants Allbee, Anderson, and Montgomery intentionally upheld policies, practices, and customs associated with the violation of Sheridan's clearly established First Amendment rights and due process rights under the 14th Amendment.

325. Defendants Allbee, Anderson, and Montgomery were deliberately indifferent and failed to train, which caused the decision to permanently expel Sheridan.

326. In engaging in *Monell* liability against Sheridan, Defendants acted with reckless, wanton, or callous indifference to Sheridan's protected constitutional rights.

327. Defendants violated Sheridan's clearly established rights by permanently expelling Sheridan because of Sheridan's speech in Sheridan's cell phone video.

328. Sheridan is entitled to compensatory damages for Defendants' violation of Sheridan's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

329. Sheridan is entitled to punitive damages for Defendants' reckless or callous indifference to Sheridan's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

330. Sheridan is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

331. Sheridan is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Sheridan's First Amendment rights.

332. Sheridan is entitled to immediate reinstatement to WMU, to resume all school activities, and to complete his diploma at WMU.

333. Sheridan is entitled to an expungment of his record and the removal of any reference to an expulsion from WMU from Sheridan's transcript and permanent record.

**Count IV: Fourteenth Amendment Violation – Procedural Due Process (Against All Defendants)**

**(Fourteenth Amendment; 42 USC § 1983)**

334. Sheridan re-alleges and incorporates by reference paragraphs 1 through 333 of this Complaint.

335. Sheridan has a protected property interest in his continued education.

336. Sheridan has a protected liberty interest his good name, reputation, honor, and integrity.

337. And Sheridan can show a stigma, plus his protected property interest, in his continuing education. *Goss v Lopez*, 419 US 565; 95 S Ct 729 (1975); *Flaim v Med Coll of Ohio*, 418 F 3d 629 (6th Cir 2005); *Doe v University of Cincinnati*, 872 F 3d 393 (6th Cir 2017); *Doe v Miami University*, 882 F 3d 579 (6th Cir 2018); *Jaksa v Regents of Univ of Mich*, 597 F Supp 1245 (ED Mich 1984); *J Endres v Northeast Ohio Med Univ*, 938 F3d 281 (6th Cir 2019); *Wisconsin v Constantineau*, 400 US 433; 91 S Ct 507 (1971); *Paul v Davis*, 424 US 693 (1976); *Miskowski v Martin*, 57 Fed Appx 246 (6th Cir 2003).

338.     Sheridan has been prejudiced by the decisions of WMU and by WMU's continuing violation of Sheridan's rights; and Sheridan's information and defense to the allegations against him would have led to a different outcome but for WMU's violation of Sheridan's rights. *Baynes v Cleland*, 799 F 3d 600 (6th Cir 2015); *Brosseau v Haugen*, 543 US 194 (2004); *Mendoza-Garcia v Barr*, 918 F 3d 498 (6th Cir 2019); *Sako v Gonzales*, 434 F 3d 857 (6th Cir 2006). This violated Sheridan's clearly established rights.

339.     Moreover, WMU: (a) failed to provide Sheridan with the appropriate notice of the allegations against Sheridan, including written notice, (b) failed to identify and produce any accuser of any alleged misconduct against Sheridan, (c) failed to provide Sheridan with the names of witnesses and a list of other evidence the school intended to present against Sheridan, (d) failed to provide Sheridan with a meaningful opportunity to present a defense, (e) failed to provide Sheridan with an opportunity to explain his version of the facts, (f) failed to provide Sheridan with a neutral and impartial decision-maker, and (g) failed to provide Sheridan, or his agent, with the opportunity to cross-examine any accuser and any adverse witness in the presence of a neutral fact-finder – where WMU's determination turns on the credibility of the accuser, the accused, or other witnesses. *Doe v University of Cincinnati*, 872 F 3d 393 (6th Cir 2017); *Doe v Baum*, 903 F 3d 575 (6th Cir 2018); *Newsome v Batavia Local Sch Dist*, 842 F 2d 920 (6th Cir 1988); *Withrow v Larkin*, 421 US 35; 95 S Ct 1456 (1975) ("a biased decisionmaker [is] constitutionally unacceptable"). This violated Sheridan's clearly established rights.

340.     Defendants failed to train its employees and acted deliberately indifferent to Sheridan's rights in violating Sheridan's procedural due process rights.

341. In engaging in violations of Sheridan's procedural due process rights, Defendants acted with reckless, wanton, or callous indifference to Sheridan's protected constitutional rights.

342. Defendants violated Sheridan's clearly established rights by permanently expelling Sheridan because of Sheridan's speech in Sheridan's cell phone video.

343. Sheridan is entitled to compensatory damages for Defendants' violation of Sheridan's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

344. Sheridan is entitled to punitive damages for Defendants' reckless or callous indifference to Sheridan's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

345. Sheridan is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

346. Sheridan is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Sheridan's First Amendment rights.

347. Sheridan is entitled to immediate reinstatement to WMU, to resume all school activities, and to complete his diploma at WMU.

348. Sheridan is entitled to an expungment of his record and the removal of any reference to an expulsion from WMU from Sheridan's transcript and permanent record.

349. Moreover, Defendants must make changes to their policies, practices, customs, and procedures by: (i) naming any accuser who makes a complaint against a student involved in a disciplinary proceeding, (ii) providing an accused student with written copies of all records, documents, reports, and information that WMU and its staff rely

upon in making a disciplinary decision, (iii) compelling adverse witnesses to appear or be available for an appearance at a disciplinary hearing, (iv) allowing cross examination of the accuser and any adverse witnesses in the presence of a neutral fact-finder for all disciplinary hearings where credibility is at issue, and (v) allowing an agent or support person to assist in the disciplinary hearing, including the ability to speak and to cross examine any witnesses where credibility is at issue. Implementing such changes will not impose undue fiscal and administrative burdens upon WMU. *Matthews v Eldridge*, 424 US 319 (1976).

### Count IV: Fourteenth Amendment Violation – Substantive Due Process (Against All Defendants)

### (Fourteenth Amendment; 42 USC § 1983)

350. Sheridan re-alleges and incorporates by reference paragraphs 1 through 349 of this Complaint.

351. For the reasons set forth above, Defendants have deprived Sheridan of his constitutionally protected right to continued enrollment at WMU, which has been assumed, *arguendo*, by United States Supreme Court, in cases involving college students who challenge dismissals from state universities. *Megenty v Stenger*, 27 F 3d 1120 (6th Cir 1994); *Regents of Univ of Mich v Ewing*, 474 US 214; 106 S Ct 507 (1985); *Bd of Curators v Horowitz,* 435 US 78; 98 S Ct 948 (1978).

352. Defendants deprived Sheridan of his protected property interests: in his continuing education and in a transcript unmarred by a permanent expulsion on his record. Defendants' decision to permanently expel Sheridan was done in violation of Sheridan's constitutionally protected First Amendment rights, was patently unreasonable,

and was disproportionate to any alleged offense that WMU asserts that Sheridan committed.

353. And Defendants' decision to permanently expel Sheridan was arbitrary and capricious, not supportable on any rational basis, was a willful and unreasoning action, was without consideration and in disregard of the facts and circumstances of Sheridan's case, and shocks the conscience. *Valot v Southeast Local Sch Dist Bd of Educ*, 107 F 3d 1220 (6th Cir 1997); *Silver v Franklin Twp Bd of Zoning Appeals*, 966 F 2d 1031 (6th Cir 1992); *Pearson v City of Grand Blanc*, 961 F 2d 1211 (6th Cir 1992) (quoting *Stevens v Hunt*, 646 F 2d 1168 (6th Cir 1981); See also *Ala & Coushatta Tribes v Big Sandy Sch Dist*, 817 F Supp 1319 (ED Tex 1993).

354. Further, there is no sufficient post-deprivation remedy sufficient to absolve Defendants of its constitutional violations in this case. *Parratt v Taylor*, 451 US 527; 101 S Ct 1908 (1981).

355. In engaging in violations of Sheridan's substantive due process rights, Defendants acted with reckless, wanton, or callous indifference to Sheridan's protected constitutional rights.

356. Defendants violated Sheridan's clearly established rights by permanently expelling Sheridan because of Sheridan's speech in Sheridan's cell phone video.

357. Sheridan is entitled to compensatory damages for Defendants' violation of Sheridan's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

358. Sheridan is entitled to punitive damages for Defendants' reckless or callous indifference to Sheridan's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

359. Sheridan is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

360. Sheridan is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Sheridan's First Amendment rights.

361. Sheridan is entitled to immediate reinstatement to WMU, to resume all school activities, and to complete his diploma at WMU.

362. Sheridan is entitled to an expungment of his record and the removal of any reference to an expulsion from WMU from Sheridan's transcript and permanent record.

363. Moreover, Defendants must make changes to their policies, practices, customs, and procedures by: (i) naming any accuser who makes a complaint against a student involved in a disciplinary proceeding, (ii) providing an accused student with written copies of all records, documents, reports, and information that WMU and its staff rely upon in making a disciplinary decision, (iii) compelling adverse witnesses to appear or be available for an appearance at a disciplinary hearing, (iv) allowing cross examination of the accuser and any adverse witnesses in the presence of a neutral fact-finder for all disciplinary hearings where credibility is at issue, and (v) allowing an agent or support person to assist in the disciplinary hearing, including the ability to speak and to cross examine any witnesses where credibility is at issue. Implementing such changes will not impose undue fiscal and administrative burdens upon WMU. *Matthews v Eldridge*, 424 US 319 (1976).

**Count IV: Breach of Contract (Against All Defendants)**

**(Michigan common law)**

364. Sheridan re-alleges and incorporates by reference paragraphs 1 through 363 of this Complaint.

365. "A student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." Anderson v Vanderbilt Univ, 450 F App'x 500 (6th Cir 2011).

366. The appropriate question in a breach of contract claim is "whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules, an objective reasonableness standard." *Faparusi v Case W Reserve Univ*, 711 F App'x 269 (6th Cir 2017).

367. In this case, for the reasons stated above, Defendants failed to provide any written notice or written allegations of any alleged misconduct to Sheridan and failed to compel the attendance of necessary witnesses for the disciplinary hearing.

368. Defendants breached their contractual obligations with Sheridan, which caused Sheridan damages.

369. In breaching its contractual obligations to Sheridan, Defendants acted with reckless, wanton, or callous indifference to Sheridan's protected constitutional rights.

370. Defendants violated Sheridan's clearly established rights by permanently expelling Sheridan because of Sheridan's speech in Sheridan's cell phone video.

371. Sheridan is entitled to compensatory damages for Defendants' violation of Sheridan's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

372. Sheridan is entitled to punitive damages for Defendants' reckless or callous indifference to Sheridan's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

373. Sheridan is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

374. Sheridan is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Sheridan's First Amendment rights.

375. Sheridan is entitled to immediate reinstatement to WMU, to resume all school activities, and to complete his diploma at WMU.

376. Sheridan is entitled to an expungment of his record and the removal of any reference to an expulsion from WMU from Sheridan's transcript and permanent record.

## REQUEST FOR RELIEF

WHEREFORE, Sheridan respectfully requests the Honorable Court to:

A. Grant Sheridan compensatory damages for Defendants' violation of Sheridan's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

B. Grant Sheridan punitive damages for Defendants' reckless or callous indifference to Sheridan's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

C. Grant Sheridan costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

D. Declare and making a finding that Defendants acted outside the scope of their authority in permanently expelling Sheridan from WMU, in violation of Sheridan's First Amendment rights.

E. Declare and make a finding that Defendants engaged in First Amendment retaliation against Sheridan.

F. Declare and make a finding that Defendants were deliberately indifferent to Sheridan and that Defendants failed to train its employees in First Amendment law and precedence.

G. Grant Sheridan prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Sheridan's First Amendment rights.

H. Grant Sheridan immediate reinstatement to WMU, allow Sheridan to resume all school activities, and allow Sheridan to complete his diploma at WMU.

I. Grant Sheridan an expungment of his record and the removal of any reference to an expulsion from WMU from Sheridan's transcript and permanent record.

J. Compel Defendants to make changes to their policies, practices, customs, and procedures by: (i) naming any accuser who makes a complaint against a student involved in a disciplinary proceeding, (ii) providing an accused student with written copies of all records, documents, reports, and information that WMU and its staff rely upon in making a disciplinary decision, (iii) compelling adverse witnesses to appear or be available for an appearance at a disciplinary hearing, (iv) allowing cross examination of the accuser and any adverse witnesses in the presence of a neutral fact-finder for all disciplinary hearings where credibility is at issue, and (v) allowing an agent or support person to assist in the disciplinary hearing, including the ability to speak and to cross examine any witnesses where credibility is at issue. Implementing such changes will not impose undue fiscal

and administrative burdens upon WMU. *Matthews v Eldridge*, 424 US 319

(1976)., and

K.  Grant any other relief as just and equitable.


Dated: March 31, 2022       /s/
         By: Eric J. Sheppard, P71914
         Attorney for Plaintiff
         2109 Hamilton Road, Suite 206
         Okemos MI 48864
         517-618-1580
         ericsheppard16@gmail.com


**I HEREBY STATE AND AFFIRM THAT I HAVE READ THE FOREGOING VERIFIED COMPLAINT AND THAT IT IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.**


Dated: March 31, 2022       /s/
         By: Sheridan Hedrick