UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERIDAN PHILLIP HEDRICK,

     Plaintiff,

v.

     Case No. 1:22-cv-308

WESTERN MICHIGAN UNIVERSITY, et al.,

     Hon. Hala Y. Jarbou

     Defendants.

_____/

## OPINION

When Plaintiff Sheridan Phillip Hedrick was an undergraduate student at Western Michigan University ("WMU"), he created a video of himself pointing a pistol at the camera and telling the viewer "You're done, you're done, you're done, bud."  He sent the video to some friends and a female classmate.  Her father reported the video to WMU.  After reviewing the video and holding disciplinary proceedings, the university expelled him on December 18, 2021.  In this action, he asserts that WMU and several of its officials violated his First Amendment rights and denied him his right to due process under the Fourteenth Amendment.  Before the Court is Hedrick's motion for a preliminary injunction (ECF No. 4).  He asks the Court to require WMU to reinstate him as a student while this lawsuit is pending.  Also before the Court is Defendants' motion to dismiss the case for failure to state a claim (ECF No. 25).  For the reasons herein, the Court will deny Hedrick's motion and grant Defendants' motion in part.

## I. BACKGROUND

In September 2021, Hedrick was a senior at WMU, which is located in Kalamazoo, Michigan.  While attending a business class, he met Carlee Castle, a female classmate.  They sat

next to one another in class and developed a friendship.  They exchanged texts and messages with one another in Snapchat.  As the semester progressed, he developed romantic feelings for her.  (*See* Compl. ¶ 69.)[1]  At the end of October 2021, he learned that she was spending time with her ex-boyfriend.  (*Id.* ¶ 92.)  He raised the issue with her, telling her in a message that he wished she had been "more upfront with [him]" and that he would "rather be friends" because he wanted to continue having conversations with her and did not want their interactions in class to "be awkward."  (*Id.*)  She responded that she "enjoy[ed] talking" but she was trying to "work things out" with her ex-boyfriend.  (*Id.* ¶ 93.)  She wrote that "being friends is a great idea."  (*Id.*)

On Thursday, November 18, 2021, Hedrick traveled to his family home in Olivet, Michigan, which is located on a farm.  There, he created a video of himself that became the basis for his expulsion from WMU.  In the video, Hedrick walks into view from the left side of the frame and says, "Oh, hey, how's it going?"  (*See* Video, Ex. 5 to Compl.)  He then spins toward the camera while drawing a pistol from his waistband.  Pointing the pistol at the camera, he says, "You're done, you're done, you're done, bud."  He then clears the chamber, ejects the magazine, puts the gun down, and walks off camera to the right.  A moment later, he returns with an AR-15 style rifle in his hands.  With the butt of the rifle pressed against his shoulder, he aims it off screen as he walks slowly out of view to the left.  Finally, he returns to the camera, smiling, and turns it off.  The entire video is approximately 25 seconds long.  He sent this video to a small group of friends via Snapchat.  Simultaneously, he sent it as an "individual message" to Castle.  (Compl. ¶ 154.)

---

[1] Hedrick asserts that his complaint is "verified"; however, but he did not comply with the local rules for filing affidavits and declarations made under penalty of perjury.  The Court requires that such documents be filed with a scanned image of the original signature.  W.D. Mich. LCivR 5.7(d)(iii).  Hedrick did not file a scanned copy of his signature.  Accordingly, the Court treats the complaint as unverified.

The next day, Hedrick sent Castle a photograph that she had taken of herself wearing overalls.  He captioned it "Country girl shit."  (Ex. 2 to Compl.)  She responded with a message saying, "Word."  (*Id.*)

Sometime after receiving the video, Castle recorded a copy of it by pointing another phone at her phone.  In that recording, as Hedrick's video is playing on her phone, Castle says, "This is the business boy that's been stalking me."  (*See* Compl. ¶ 158 (acknowledging that the voice in the recording belongs to Castle).)  Castle apparently showed this video recording to her father during the Thanksgiving break.  Castle's father reported it to the WMU police department on November 26, 2021, the day before students returned from their break.  (WMU Police Incident Rep., ECF No. 11, PageID.126.)  According to the police report, Castle's father reported that she "had a class with Hedrick and when he became romantically interested, [she] had to turn him down."  (*Id.*, PageID.127.)  She reportedly received several video messages from Hedrick where he "displayed firearms."  (*Id.*)  Castle's father told the police that, in one video not saved by Castle, Hedrick indicated "If I brought these to campus."  (*Id.*)  Castle's father reportedly said that Hedrick "began taking pictures of [Castle's] roommates and [she] thought he may be following her around because he would message her that he saw her and her boyfriend out places, but [she] never saw [him] when she was out."  (*Id.*)  The officer did not speak with Castle because she did not want to talk to the officer.  (*Id.*, PageID.128.)

Meanwhile, Hedrick sent a text to Castle on November 29, 2021, asking whether she had "submit[ted] a student mental health form" about him because he had received a call from WMU asking to "check in" on him.  (Messages, ECF No. 10, PageID.124.)  He thought "the chances" that Castle was involved "were low but he just wanted to make sure."  (*Id.*)  He wondered if it might be "a joke."  (*Id.*)  She responded as follows:

> Hi. Honestly I didn't even know mental health forms were a thing?  I don't think that mental health should be made into a joke anyway so no it wasn't me and I'm sorry that happened.  I hope u figure it out!

(*Id.*, PageID.125.)

A WMU police officer interviewed Hedrick at his workplace on November 30, 2021.  (*See* WMU Police Incident Suppl. Rep., ECF No. 11, PageID.131.)  According to a video of the interview, Hedrick said that he created the video "as a joke" after Castle said that "she never shot a gun before."  (11/30/2021 Police Video, Ex. 9 to Compl.)  He "thought [the video] was funny"; he "did not mean any harm by it."  (*Id.*)  He said she responded to him by saying "what was that." (*Id.*)  He denied making any other video with guns in it.  He told the officer that his family lives on a 200-acre farm, which is where he made the video.  He used the rifle in the video for hunting and he kept the pistol for "self-defense," but he did not bring these weapons to Kalamazoo.  (*Id.*) He denied engaging in any stalking behavior when the officer asked him about it.  He acknowledged being interested in Castle but said he stopped pursuing her after she said she was getting back together with her boyfriend.  He said he had never seen or met her boyfriend but Hedrick noted that he and Castle lived in the same apartment complex and occasionally saw one another outside of class.

Dr. Nicole Millar Allbee, Director of the Office of Student Conduct at WMU, learned of the video sent to Castle and the contents of the police report shortly thereafter.  (Allbee Decl. ¶¶ 3-4, ECF No. 28-1.)  After watching the video, she determined that it was a potential violation of WMU's Student Code, which prohibits conduct that "threatens or endangers the health, well-being, or safety of any person, including but not limited to: . . . [t]hreatening, intimidating, harassing, or coercing any person."  (*Id.* ¶ 5; WMU Student Code, ECF No. 28-1, PageID.301.)

Allbee apparently sent Hedrick a charge letter on November 30, 2021, notifying him of an "alleged violation" of the Student Code concerning threatening, intimidating, and/or harassing

behavior.  (*See* 11/30/2021 Letter, ECF No. 28-1, PageID.318.)  Allbee met with Hedrick via WebEx on December 2, 2021.  (Allbee Decl. ¶ 8.)  At their meeting, they discussed the charges and the SnapChat video.  (*Id.*)

WMU claims that it sent Hedrick a letter on December 6, 2021, notifying him of a student conduct hearing scheduled for December 9.  (*See* 12/6/2021 Letter, ECF No. 28-1, PageID.323.) That same day, Allbee met with Hedrick again via WebEx and showed him a redacted version of the police reports detailing the allegations from Castle's father and the police interview with Hedrick on November 30.  (Allbee Decl. ¶ 10.)  According to Allbee, Hedrick told her "multiple times" that "being a pilot was all he had, and that the University, [Castle], and her boyfriend were taking his future as a pilot from him."  (*Id.* ¶ 11.)

Hedrick testified at the conduct hearing, which was held before five panelists, including Allbee.  (*Id.* ¶ 16.)  He admitted sending the video but claimed that it was a joke.  He asserted that it was an imitation of a "TikTok trend."  (*Id.*)  He called four witnesses; three were friends, one was his boss.  All four witnesses testified that they received the video on Snapchat and did not consider it threatening "because of their close relationship with Mr. Hedrick."  (*Id.* ¶ 18.)  Hedrick also told the panel that Castle did not return to their class after the Thanksgiving break.  (*Id.* ¶ 23.)

By a unanimous vote, the panel concluded that Hedrick had violated the student code.  The next day, the panel unanimously concluded that Hedrick should be expelled from the university. (*Id.* ¶ 22.)

Castle did not participate in the disciplinary proceedings, so Allbee contacted her to relay the results.  According to Allbee, Castle said that she had not returned to the class she took with Hedrick.  (*Id.* ¶ 23.)  Instead, she received permission from the professor to finish the class remotely.  The panel did not consider this information in its decision.  (*Id.*)

On December 13, 2021, Allbee met with Hedrick in person to inform him of the decision. (*Id.*) As a precaution, she "stationed" plainclothes officers nearby and near Hedrick's vehicle and apartment. (*Id.* ¶ 24.)

On December 20, 2021, Hedrick appealed WMU's decision to its Appeals Board with the assistance of an attorney. (*Id.* ¶ 25.) The Appeals Board upheld WMU's decision on January 7, 2022. (*Id.* ¶ 27.) Hedrick appealed the latter decision to Dr. Diane Anderson, the Vice-President for Student Affairs. Anderson upheld that decision on January 28, 2022. (*Id.* ¶ 30.)

Hedrick filed this action in March 2022, asserting four claims against Defendants under 42 U.S.C. § 1983. Defendants are the following: WMU; WMU's Board of Trustees; Allbee; Anderson; and WMU's President, Edward Montgomery.

Hedrick asserts the following claims against Defendants: retaliation and violation of his right to free speech under the First Amendment (Counts I & II);[2] *Monell* liability (Count III); denial of procedural due process (Count IV); violation of substantive due process (Count V); and breach of contract (Count VI).

When filing this action, Hedrick asked for a temporary restraining order requiring WMU to reinstate him. The Court denied that request because Hedrick did not argue that he would be irreparably harmed before the Court could consider Defendants' response. Defendants have now responded, so the Court considers Hedrick's request as one for preliminary injunctive relief.

## II. PRELIMINARY INJUNCTION STANDARD

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v.*

---

[2] Count I of Hedrick's complaint makes a passing reference to the Michigan Constitution (*see* Compl. 50), but then characterizes the claim as one under § 1983 and the First Amendment (*id.* at 50-54). He does the same in his response to Defendants' motion to dismiss. (*See* Pl.'s Resp. 3, ECF No. 42.) Accordingly, the Court construes Count I as a First Amendment claim only.

*Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)).  The Court considers four factors when deciding whether to grant a preliminary injunction:

> (1) whether the movant has a "strong" likelihood of success on the merits;
>
> (2) whether the movant would otherwise suffer irreparable injury;
>
> (3) whether issuance of a preliminary injunction would cause substantial harm to others; and
>
> (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction."  *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

### III. PRELIMINARY INJUNCTION ANALYSIS

#### A. Likelihood of Success

Hedrick's motion for a preliminary injunction "focuses on the First Amendment issues presented in this case," so the Court will evaluate his likelihood of success on his First Amendment claim.  (*See* Pl.'s Br. in Supp. of Mot. for TRO 12, ECF No. 5.)

#### 1. Restrictions on Student Speech – *Tinker* Standard

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  This case involves a public university's response to the speech and expressive conduct of one of its students.  "[W]here state-operated educational institutions are involved, [the Supreme Court] has long recognized 'the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental

constitutional safeguards, to prescribe and control conduct in the schools.'"  *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969)).  At the same time, however, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker*, 393 U.S. at 506; *Mahanoy Area Sch. Dist v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2044 (2021).  There is "no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."  *Widmar v. Vincent*, 454 U.S. 263, 269 (1981).  Nevertheless, courts apply the First Amendment "in light of the special characteristics of the school environment."  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1998).  "One such characteristic . . . is the fact that schools at times stand *in loco parentis*, *i.e.*, in place of parents."  *Mahanoy*, 141 S. Ct. at 2044-45.

In *Tinker*, the Supreme Court held that public schools can prohibit student "speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others."  *Tinker*, 393 U.S. at 513; *see Morse v. Frederick*, 551 U.S. 393, 403 (2007) ("*Tinker* held that student expression may not be suppressed unless school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" (quoting *Tinker*, 393 U.S. at 513).  To justify its actions, the school "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  *Tinker*, 393 U.S. at 509.  "*Tinker* does not prescribe a uniform, 'one size fits all' analysis.  The Court must consider the content and context of the speech, and the nature of the school's response."  *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007).

More recently, in *Mahanoy*, the Supreme Court clarified that a school's interest in regulating student speech is "diminished" where, as in this case, that speech occurs off campus.  *Mahanoy*, 141 S. Ct. at 2046.  In such circumstances, schools "will rarely stand *in loco parentis*[.]"

*Id.*  The *in loco parentis* rationale applies "where the children's actual parents cannot protect, guide, and discipline them."  *Id.*  However, the school's interests "remain significant" in the following circumstances: "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students[.]"  *Id.* at 2045.

*Tinker* and *Mahanoy* involved high schools and middle schools.  Universities are different from those types of schools due to the "age, independence, and living arrangements" of the students who attend them.  *See Mahanoy*, 141 S. Ct. at 2049 n.2 (Alito, J., concurring).  In other words, universities do not act *in loco parentis* in the way that grade schools do, so *Mahanoy* and *Tinker* do not squarely apply here.  *See McCauley v. Univ. of Virgin Islands*, 618 F.3d 232, 242 (3d Cir. 2010) (discussing the differences between public universities and public elementary or high schools).  For that reason, Hedrick asks the Court to give his speech the same protection that a regular person would receive "in matters of adult public discourse."  (Pl.'s Br. in Supp. of TRO 17 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)).  In such matters, "[t]he First Amendment guarantees wide freedom[.]"  *Id.*

Like high schools and elementary schools, however, universities have some leeway to restrict speech that "causes 'substantial disruption of or material interference with school activities.'"  *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (quoting *Tinker*, 393 U.S. at 514, in a case involving a graduate-level counseling program).  Indeed, the Court of Appeals for the Sixth Circuit has cited *Tinker* when determining whether universities violated the First Amendment by disciplining students for their speech, *see Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 208 (6th Cir. 1998), or by restricting student assembly, *see Krause v. Rhodes*, 570 F.2d 563, 571 (6th Cir. 1977).

In *Salehpour*, for instance, the student "disrupt[ed] the classroom milieu for the sole purpose of advancing and pursuing his admitted 'power struggle' with the University[.]" *Salehpour*, 159 F.3d at 208.  The Court of Appeals held that this conduct was not protected by the First Amendment, as it "appear[ed] to have no intellectual content or even discernable purpose, and amount[ed] to nothing more than expression of a personal proclivity designed to disrupt the education process[.]" *Id.*  The court noted that the school had a "compelling interest . . . to educate in an environment that is free of purposeless distractions and is conducive to teaching."  *Id.*

In *Krause*, students at Kent State University challenged a temporary ban on assembly after other students had engaged in "violence and vandalism" over a three-day period.  *Krause*, 470 U.S. at 570.  The Court of Appeals rejected their challenge, noting that "'[a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.'"  *Id.* at 571 (quoting *Healy*, 408 U.S. at 189).

Similarly, the Supreme Court has cited *Tinker* for the proposition that state universities have an "undoubted prerogative to enforce reasonable rules governing student conduct," while acknowledging that "state colleges and universities are not enclaves immune from the sweep of the First Amendment."  *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 669-70 (1973). In *Papish* itself, the Supreme Court noted "the absence of any disruption of campus order or interference with the rights of others" when concluding that the university had violated a graduate student's right to freedom of speech, suggesting that a university could consider those factors when disciplining student speech.  *Id.* at 670 n.6.  Thus, case law indicates that the "substantial disruption [or] material interference" standard in *Tinker* has some application to the university setting.  *See*

*Yoder v. Univ. of Louisville*, 526 F. App'x 537, 546 n.3 (6th Cir. 2013) (noting that, in *Ward*, "this court expressly held that school-speech standards may be applicable to university students").

### 2. Restrictions on Student Speech – *Hazelwood* Standard

A different standard, stemming from *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), looks at whether a school's restrictions on "'student speech in school-sponsored expressive activities'" are "'reasonably related to legitimate pedagogical concerns[.]'"  *Ward*, 667 F.3d at 733 (quoting *Hazelwood*, 484 U.S. at 271).  In other words, "[a] school need not tolerate student speech that is inconsistent with its basic educational mission.'"  *Id.* (quoting *Hazelwood*, 484 U.S. at 266).  The latter standard applies with equal force in the university setting.  *Id.* at 733 ("*Hazelwood* respects the latitude educational institutions—at any level—must have to further legitimate curricular objectives.").  However, "the less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a legitimate pedagogical concern[.]"  *Id.* at 734.

The *Hazelwood* standard does not apply here because there is no connection between Hedrick's conduct and school-sponsored activities.  There is no question that Hedrick's video is associated with him alone and not WMU.  *See Morse*, 551 U.S. at 423 (Alito, J., concurring) (noting that *Hazelwood* "allows a school to regulate what is in essence the school's own speech"); *Ward*, 667 F.3d at 732 (characterizing *Hazelwood* as supporting a school's "authority to control [its] own speech").

### 3. *Tinker* Analysis

Applying the principles discussed above, Hedrick has not clearly shown that he is likely to succeed on the merits of his claim.  Hedrick sent a video of himself to a female classmate wherein he pointed a pistol directly at the camera and repeatedly pushed it toward the lens, saying, "You're done, you're done, you're done, bud."  After putting the pistol down, he picked up a rifle and

walked with it off screen in a manner suggesting that he was hunting something (or someone). There is no evidence that he provided context for the video or told Castle that he meant it as a joke.[3]  For instance, she would not have known that he sent it to others as well.  And when WMU first learned of the video, Castle had described Hedrick in the video as someone who was "stalking" her.  Also, her father reported that Hedrick had romantic feelings for her, that she had turned him down, and that he was following her around outside school.

That said, this is not an obvious case of threatened harm.  Context is important when distinguishing a genuine threat from a joke, and when assessing the foreseeable impact of such speech.  Hedrick sent the video to multiple people, which suggests that he was not targeting Castle or any particular person.  Castle would not have known that he sent the video to others, but WMU did.  Also, Hedrick's reference to "bud" suggests that he was not referring to Castle herself.  To be sure, Hedrick's behavior looks more ominous when accompanied by Castle's and her father's accusation that Hedrick had been "stalking" her, but there is nothing in the record before the Court to support that accusation.  Also, some of Castle's actions suggest that she did not perceive the video as threatening.  She responded to some of his messages even after he sent the video.  And she never reported his video to WMU; her father did.

Hedrick notes that his speech occurred off campus.  He created it at his home and sent it to Castle, who presumably received it from him while she was off campus.  *Mahanoy* indicates that a school's interests in disciplining speech are diminished where that speech occurs off campus, but those interests "remain significant" in a situation that involves a threat by one student against another.  *Mahanoy*, 141 S. Ct. at 2045-46.  Enforcing a student code that prohibits threats of harm

---

[3] Hedrick alleges in his complaint that he sent the video after she asked him whether he "had ever shot a gun before." (Compl. ¶ 111.)  But his complaint is not properly verified, so the Court does not consider his allegations as evidence. He also made a similar comment to the police, but that statement was not under oath.

by one student against another is a reasonable restriction on student speech, particularly where that speech occurs during the school term and is reasonably likely to disrupt the ability of another student to continue her studies.   Such codes prevent material disruption in classwork and interference with the rights of the recipient.  The off-campus location of a threat sent via electronic means does little to mitigate its potential for disruption and interference.  In other words, the off-campus location of Hedrick's speech may have diminished, but it did not vitiate, WMU's ability to discipline him for his speech consistent with his First Amendment rights.

In short, on the present record, WMU had some grounds for concluding that Hedrick's video was a threat of harm toward Castle (or her boyfriend) and that Castle perceived it as such. In other words, the Court can understand why WMU might have concluded that the video could materially disrupt the work and discipline of the school, or that it interfered with Castle's right "to be secure and to be let alone." *Tinker*, 393 U.S. at 508.

On the other hand, the Court notes that WMU resorted to the most severe sanction possible. It expelled Hedrick rather than opt for a more limited form of discipline.   The Court can consider "the nature of the school's response" as part of the *Tinker* analysis.    *Lowery*, 497 F.3d at 588. WMU's response in this case suggests a level of discomfort with Hedrick's video that exceeded its interest in protecting Castle.  It did not take any immediate measures to separate Hedrick from Castle before the disciplinary proceedings were held.  And instead of removing him from her class or suspending him, it permanently barred him from continuing his studies.  Also, for reasons that are not clear, WMU apparently never investigated the actual impact of the video on Castle until after it made its decision.

As discussed above, case law indicates that universities have less leeway to police student conduct than public high schools and elementary schools because universities do not stand *in loco*

*parentis* to the adult students who attend their institutions.  Presumably, this means that universities are not the ones primarily responsible for protecting their students from harm.  WMU's interests are strongest where there is a reasonably foreseeable risk of substantial disruption of the school environment or interference with the rights of others.  But by that measure, WMU's response looks somewhat odd.  The video ostensibly impacted Castle more than anyone else, but WMU chose not involve Castle in the disciplinary proceedings at all.

In summary, under the *Tinker* analysis, Hedrick's case presents a close call.  On the one hand, his conduct looks somewhat like a threat of harm against another student; courts have generally given schools permission to discipline such speech without running afoul of the First Amendment.  On the other hand, assessing the nature of such a threat is a highly fact and context-specific inquiry.  Here, some facts support Hedrick's assertion that his video was not a threat, while other facts support the opposite conclusion.

Accordingly, considering all the circumstances, the Court is not persuaded that Hedrick has made a strong or substantial showing of a likelihood of success under the *Tinker* standard.

### 4. True Threats

Alternatively, WMU argues that Hedrick's video was not protected speech because it was a "true threat."  *See Virginia v. Black*, 538 U.S. 343, 359 (2003).  Such threats "encompass statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Id.*  The speaker "need not actually intend to carry out the threat."  *Id.*  Rather, the prohibition on threats "'protect[s] individuals from the fear of violence' and 'from disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'"  *Id.* (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)).

14

Hedrick suggests that the Court should look to the following objective factors to determine whether his video constituted a "true threat":

> how the recipient and other listeners reacted to the alleged threat, whether the threat was conditional, whether it was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.

*United States v. Hart*, 212 F.3d 1067, 1071 (8th Cir. 2000).  These factors focus on the perception of the alleged threat by the recipient.  Similarly, WMU argues that the Court should consider whether a reasonable person would have viewed Hedrick's video as a threat of harm under all the circumstances.  WMU argues that Hedrick's subjective intent is irrelevant when determining whether his conduct was a true threat.  (WMU's Resp. in  Opp'n to Mot. for TRO 21, ECF No. 28; WMU's Br. in Supp. of Mot. to Dismiss 15, ECF No. 26.)

Neither party addresses the Sixth Circuit's statement that, "to be a true threat, the defendant must *subjectively intend* his communication to be threatening."  *United States v. Doggart*, 906 F.3d 506, 512 (6th Cir. 2018) (citing *Elonis v. United States*, 575 U.S. 723, 737 (2015) (emphasis added)).  But it is doubtful that those cases apply here, as *Doggart* and *Elonis* were considering the mental state required for a conviction under 18 U.S.C. § 875(c), which prohibits transmitting threats to injure another person.  The reason for requiring a subjective intent when convicting a person of violating this statute is to "respect[] the customary requirement that a crime contain a state-of-mind element[.]"  *Doggart*, 906 F.3d at 512.  In other words, the courts in *Doggart* and *Elonis* were considering how best to interpret and apply a criminal statute.  They were not opining on the contours of what constitutes unprotected speech under the First Amendment.  *See Elonis*, 135 S. Ct. at 2012 (declining to consider First Amendment issues).  Those courts did not foreclose the possibility that a threat could qualify as unprotected speech when the speaker does not subjectively intend to convey a threat.

15

Hedrick cites *People v. Osantwoski*, 736 N.W.2d 289 (Mich. Ct. App. 2007) for the proposition that Michigan law requires "the existence of an intent to 'intimidate' or coerce[.]'" *Id.* at 298 (quoting Mich. Comp. Laws § 750.543b).  But there, the Michigan Court of Appeals was simply reciting the terms of a Michigan statute; it was not dictating the standard for unprotected speech under the First Amendment.

As indicated, assessing whether Hedrick's video could reasonably be perceived as a genuine threat of violence, let alone a true threat, is a fact-intensive inquiry.  Using the factors provided by Hedrick, some arguably weigh in his favor, while others do not.  On the one hand, there is no indication that he made similar statements to Castle on other occasions.  Also, he sent the video to multiple people; he did not send it to Castle alone.  His friends said they did not view his video as threatening.  These facts weigh in his favor.  On the other hand, Hedrick repeatedly pointed a weapon at the camera and said "You're done," implying that he was shooting the recipient of the video.  Hedrick's friends told WMU that they did not view the video as threatening *because they knew him*.  And he sent the video directly to Castle, whereas they received it as a group.  Consequently, they would have been less likely to view it as personally threatening.  Finally, some evidence suggests that Castle herself viewed the video as threatening.  She showed it to her father, who reported it to WMU.  Also, she did not return to her class with Hedrick after the Thanksgiving break.  Thus, these facts weigh in favor of WMU.

Because some facts favor Hedrick and others favor Defendants, the Court cannot say with confidence at this early stage of the case that Hedrick meant to communicate a serious expression of intent to commit an act of violence.  Accordingly, the Court cannot conclude that Hedrick's speech was a true threat and therefore beyond the protection of the First Amendment.

16

### B. Irreparable Harm

Hedrick notes that where there is a violation of the right to free speech under the First Amendment, irreparable harm is presumed. *See D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 522 (6th Cir. 2007) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Hedrick has suffered irreparable harm if his First Amendment rights have been violated, but the Court is not persuaded that he has demonstrated a substantial likelihood of success on that claim. Accordingly, the Court is not persuaded that he has demonstrated irreparable harm.

### C. Harm to Others

WMU asserts that allowing Hedrick to return to campus would undermine Castle's ability to continue her studies. It offers no evidence to support this assertion, apart from Allbee's declaration that Castle did not return to the one class that she shared with Hedrick. WMU also relies on its interest in maintaining a safe campus, but the extent of that interest here depends on whether Hedrick's conduct was a threat of violence. For reasons discussed, that issue presents a close question. Nevertheless, this factor weighs slightly in WMU's favor.

### D. Public Interest

Allowing a school to respond to threats of harm is in the public interest. On the other hand, protecting First Amendments rights is also in the public interest. This factor does not weigh for or against an injunction.

### E. Conclusion

Weighing all the factors, the Court concludes that a preliminary injunction is not warranted.

### IV. DISMISSAL STANDARD

Defendants also seek dismissal of the complaint. A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v.*

*Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56.  *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

## V. DISMISSAL ANALYSIS

### A. Sovereign Immunity & Official Capacity Liability

Defendants assert that Hedrick can only bring claims under 42 U.S.C. § 1983 against the individual defendants in their individual capacities.  "Neither a state nor its officials acting in their official capacities are considered 'persons' under § 1983." *Stephens v. Hayes*, 374 F. App'x 620, 623 (6th Cir. 2010) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  In addition, Defendants argue that the Eleventh Amendment bars federal claims against the State of

Michigan and institutions like WMU, which is an arm of the state.  *See Will*, 491 U.S. at 66. Defendants further argue that the Eleventh Amendment bars claims against the individual defendants in their official capacities.  Accordingly, Defendants ask the Court to dismiss the § 1983 claims against WMU, its Board of Trustees, and the individual defendants in their official capacities.

### 1. WMU & Board of Trustees

Regardless of the form of relief requested, the states and their departments are immune from suit in the federal courts under the Eleventh Amendment unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *See Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).

As an arm of the state of Michigan, WMU is entitled to invoke sovereign immunity.  *See Estate of Ritter by Ritter v. Univ. of Mich.*, 851 F.2d 846, 848-50 (6th Cir. 1988) (recognizing that Michigan state universities are immune from suit in federal court); *Benzie v. W. Mich. Univ.*, 19 F. App'x 360, 361 (6th Cir. 2001) (affirming that WMU is entitled to sovereign immunity).  The same conclusion applies to WMU's Board of Trustees because it is also an arm of the state and any judgment against it would come out of state funds.  *Cf. Uraz v. Mich. State Univ. Bd. of Trs.*, No. 1:19-CV-223, 2019 WL 2442314, at *3 (W.D. Mich. June 12, 2019) (concluding that the Board of Trustees of Michigan State University can invoke sovereign immunity); *see also Heike v. Cent. Mich. Univ. Bd. of Trs.*, No. 10–11373–BC, 2011 WL 2602004, at *14 (E.D. Mich. July 1, 2011) ("[U]nder Michigan law, the Board of Trustees of the University *is* the University.").

## 2. Individual Defendants

"[I]n *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court announced an exception to Eleventh Amendment immunity for claims for injunctive relief against individual state officials in their official capacities." *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002).  That immunity "does not bar a suit against a state official seeking *prospective* injunctive relief to end a continuing violation of federal law." *Id.* at 398 (emphasis added).  Here, Hedrick seeks declaratory and prospective injunctive relief, including reinstatement to WMU and the expungement of any reference to his expulsion.  (*See* Compl., PageID.66.)  Those remedies are not barred by the Eleventh Amendment; they are permitted by *Ex Parte Young*.  *See Carten*, 282 F.3d at 396 (holding that reinstatement of students to an academic program is prospective relief that is not subject to the Eleventh Amendment); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (same conclusion for a remedy compelling the defendants "to remove [a] negative notation from [students'] disciplinary records that resulted from the allegedly unconstitutional disciplinary process").  Although Hedrick's request for damages against Defendants in their official capacities is barred by the Eleventh Amendment, Hedrick can seek declaratory and prospective injunctive relief against them.

### B. Counts I - II (First Amendment)

#### 1. *Tinker* Standard

Counts I and II of the complaint are premised on a First Amendment violation stemming from WMU's response to Hedrick's video.  Viewing the allegations and evidence in a light most favorable to Hedrick, he has stated a plausible claim for a violation of his First Amendment rights under the *Tinker* standard.  In addition to the evidence in the record discussed in Section III above, the Court also considers the factual allegations in Hedrick's complaint, which the Court must assume are true at this stage.  Here, Hedrick has alleged facts suggesting that WMU did not respond

reasonably when expelling him from the school for creating a video that could be construed as a joke rather than a genuine threat of harm.  For instance, he alleges the following:  he sent the video to Castle after she asked him whether he had ever shot a gun (Compl. ¶ 110); she responded to his video with a message stating "what was that :)" (*id.* ¶ 160); she never expressed concerns to him about the video (*id.* ¶ 165); he did not follow Castle around or engage in any "stalking" behavior (*id.* ¶ 183)—in fact, he lived in the same apartment complex as Castle and her boyfriend (*id.* ¶ 203); and Hedrick did not make a separate video in which he displayed guns and said "if I brought these to campus" (*id.* ¶ 181).  The Court also notes that WMU did not speak with Castle directly or attempt to assess its impact on her before making its disciplinary decision.  Instead, Allbee called Castle after the proceedings were complete.  Although *Tinker* permits a school to discipline student speech where it reasonably foresees a risk of material disruption or interference with the rights of others, WMU's failure to speak to Castle directly or to investigate the video's impact on her arguably suggests that it did not view Hedrick's video as a significant threat to, or interference with, her rights.

As evidence for a substantial disruption to the work and discipline of the school, Defendants also point to the following circumstances:  (1) Hedrick's "threatening" video; (2) the fact that Castle's father reported his concerns about the video; (3) the police investigation; (4) and Allbee's investigation before the disciplinary hearing.  (Defs.' Reply Br. 8, ECF No. 43.)  But the first is the asserted cause of the disruption and not the disruption itself.  The second and third are merely a report from a concerned parent and an investigation of that parent's concern, which apparently involved little more than a phone call to WMU and a brief police interview with Hedrick.  And the fourth is simply an investigation into whether Hedrick violated the student code.  Receiving complaints and investigating them are routine aspects of administering a university,

which is why universities like WMU employ staff to handle these tasks. Accordingly, the Court is not persuaded that the foregoing circumstances constitute "a substantial disruption of or material inference with school activities" at WMU. *See Tinker*, 393 U.S. at 514.

In short, Hedrick has alleged enough to state a plausible claim that WMU did not respond reasonably to his conduct and that it expelled him due to discomfort with the content of his speech, in violation his First Amendment rights.

This case is distinguishable from those cited by Defendants. *See, e.g.*, *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 759-60 (8th Cir. 2011) (high school student suspended for the school year for sending numerous texts to friends discussing particular students he did not like and who he wanted to kill with a gun); *Wisniewski v. Bd. of Ed. Of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 36 (2d Cir. 2007) (eighth grader suspended for one semester for creating and displaying a computer icon depicting a pistol firing a bullet at someone's head along with the words "Kill Mr. VanderMolen," who was the student's teacher); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 980-81 (11th Cir. 2007) (high school student suspended after writing in her school notebook that she disliked a teacher and fantasized about shooting him in the head). Those cases involved middle school and high school students, not college students. As discussed above, states have less leeway to discipline student speech in the college and university context. *See College Republicans v. Reed*, 523 F. Supp. 2d 1005, 1015 (N.D. Cal. 2007) ("As the courts often have acknowledged, the state does not require higher education and has much less interest in regulating it, the students in colleges and universities are not children, but emancipated (by law) adults, and, critically, the mission of institutions of higher learning is quite different from the mission of primary and secondary schools."). Also, unlike Hedrick, none of the students in those cases was permanently expelled.

### 2. True Threat

Defendants also contend that Hedrick's video is not protected speech because it was a true threat.  For the reasons discussed in Section III above, the Court is not persuaded by that argument.

In summary, the Court is not persuaded by Defendants' argument that the complaint fails to state a First Amendment claim.

### C. *Monell* Liability (Count III)

Defendants contend that Hedrick fails to state a claim for liability under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978) because he does not sue a municipality.  The holding in *Monell* is limited to "'local government units which are not considered part of the State for Eleventh Amendment purposes[.]'"  *Will*, 491 U.S. at 70 (quoting *Monell*, 436 U.S. at 690 n.54).  Hedrick does not sue such a local government unit.  WMU and its Board of Trustees are arms of the state, so *Monell* does not apply to them.  Accordingly, the Court will dismiss Count III.

### D. Procedural Due Process (Count IV)

The elements of a procedural due process claim are (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process.  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  "'The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'"  *Consol of Ky., Inc. v. Madden*, 829 F. App'x 90, 97 (6th Cir. 2020) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  Defendants do not contest that Hedrick's expulsion implicates a protected interest.  *See Doe v. Miami Univ.*, 882 F.3d 579, 599 (6th Cir. 2018).  Instead, they contend that he received all the process to which he was due.

Generally, "there are two basic due process requirements: (1) notice, and (2) an opportunity to be heard."  *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005).  When a student faces expulsion, due process requires, at a minimum, "(1) notice of the charges; (2) an explanation

23

of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker." *Cummins*, 662 F. App'x at 446.

As to notice, "[t]he stronger the private interest, . . . the more likely a formal written notice—informing the accused of the charge, the policies or regulations the accused is charged with violating, and a list of possible penalties—is constitutionally required." *Id.* at 635. Expulsions generally require more formal procedures than short-term suspensions. *Id.* "In some circumstances where factual issues are disputed, notice might also be required to include the names of witnesses and a list of other evidence the school intends to present." *Id.*

As to the opportunity to be heard, "[w]hen a school imposes a serious sanction like dismissal to address a student's disciplinary misconduct, the student is entitled to . . . a hearing to 'present his side of the story.'" *Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 297 (6th Cir. 2019) (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). That hearing "must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.'" *Flaim*, 418 F.3d at 635 (quoting *Gorman v. Univ. of R.I.*, 837 F.2d 7, 13 (1st Cir. 1988)). The right to respond and defend

> will generally include the opportunity to make a statement and present evidence. It may also include the right to call exculpatory witnesses. Some circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases.

*Id.* at 636 (citation omitted).

### 1. Notice

Here, WMU contends that it notified Hedrick of the charge against him and then held a hearing at which Hedrick was given the opportunity to make a statement and present evidence, including testimony from his friends. (*See* Compl. ¶¶ 269, 271.) Hedrick alleges that he never received any written charges from WMU. WMU responds with a copy of a charge letter that it

sent him; that letter identifies the portion of the student code that he allegedly violated. (*See* 12/6/2021 Letter, ECF No. 28-1, PageID.323.)  Although that letter is not properly before the Court on a motion to dismiss, Hedrick acknowledges that he received it.  (*See* Pl.'s Resp. to Mot. to Dismiss 7, ECF No. 42 ("The record evidence shows that [Hedrick] received a WebEx invitation and an alleged "charge letter" (Defendants' Exhibit B)[.]").)

At any rate, Hedrick complains that the letter only mentions the relevant provision of the student code; it does not provide any facts about the conduct at issue.  However, it is clear from his complaint that WMU separately notified him that the charges were based on the video he sent to Castle.  According to his complaint, when he met with Allbee on December 2, she showed him "a portion of [Castle's] recording of [Hedrick's] cell phone video[.]"  (Compl. ¶ 250.)  In response, he "denied engaging in any threatening behavior."  (*Id.* ¶ 246.)  Specifically, he "told Dr. Allbee that the cell phone video was a joke and based off of the popular TikTok trend for 'You're done' videos."  (*Id.*)  Allbee allegedly did not play him the portion of the video where Castle refers to Hedrick as the "business boy" who was "stalking" her.  (*Id.* ¶ 252.)  Nevertheless, Hedrick allegedly "denied all allegations of stalking behavior to Dr. Allbee."  (*Id.* ¶ 248.)  Thus, before the disciplinary hearing, Hedrick was at least aware that his video was the basis for the charge and that stalking was *potentially* an issue.  *See Cummins*, 662 F. App'x at 447 (notice was sufficient where student "received written notice of the charges" and "had a follow-up meeting . . . to discuss the allegations").

But more troubling is what WMU does not address in its briefing, which is the fact that Allbee allegedly misled Hedrick by telling him that his disciplinary hearing "was not about stalking allegations" (*id.* ¶ 252), and then at the hearing she played Castle's version of the video, which included the stalking comment.  (*Id.*)  Although WMU did not charge Hedrick with stalking,

Castle's accusation is potentially relevant to the threatening behavior charge. It changes the context for how Hedrick's video would be perceived. Even Defendants use that accusation to argue that a reasonable person in Castle's position would view Hedrick's video as threatening. (*See* Defs.' Br. in Supp. of Mot. to Dismiss 15, ECF No. 26.)

WMU cites *Flaim*, arguing that it was not required to "inform [Hedrick] of the evidence and or testimony that [it] would present[.]" *Flaim*, 418 F.3d at 639. But that case is distinguishable. There, the college charged the student with a violation of its policy for conduct that was the subject of state criminal charges regarding drug use. The court noted that the student "was clearly on notice as to the reasons for the hearing [because] . . . [h]e had already been convicted of a drug felony, a fact not likely to have escaped his grasp." *Id.* In that situation, the court could not discern the "benefit to [the student] or any reduced risk of error by requiring [additional] detail [in the notice]." *Id.*

In contrast, Hedrick alleges that he was not on notice that he had been accused of stalking by Castle or that WMU would take that accusation into consideration when assessing his video. Because WMU arguably failed to give Hedrick an adequate "explanation of the evidence against him," *see Cummins*, 662 F. App'x at 446, and then allegedly misled him about the basis for the proceedings against him, the Court is not persuaded that Hedrick fails to a plausible claim as to notice and a meaningful opportunity to prepare for and respond to the charge against him.

### 2. Cross-Examination

Hedrick also complains that Allbee never informed him of the identity of his accuser (i.e., Castle's father) and did not give Hedrick the opportunity to cross-examine that accuser. The right to cross-examination in student disciplinary procedures exists only "'in the most serious of cases.'" *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) (quoting *Flaim*, 418 F.3d at 636). "[W]hen the university's determination [of student misconduct] turns on the credibility of the

accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

Defendants respond that the right to cross-examination applies only in the context of Title IX sexual misconduct proceedings. In *Baum*, the Court of Appeals noted the "substantial interest at stake when it comes to school disciplinary proceedings for sexual misconduct." *Baum*, 903 F.3d at 582. But the language of that court's opinion does not limit the right to cross-examination to Title IX cases. Indeed, it concluded that there was a right to cross-examination *before* it discussed the "substantial interest" at stake in that case due to the accusation of sexual misconduct. *See id.* at 581-82. Similarly, in *Flaim*, the Court of Appeals considered whether a student was entitled to cross-examine witnesses even though that case did not involve an accusation of sexual misconduct. *See Flaim*, 418 F.3d at 641. Finally, at least one district court has concluded that there could be a right to cross-examination outside the Title IX context. *See Doe v. Bowling Green State Univ.*, No. 3:22-cv-140, 2022 WL4599247, at *11 (N.D. Ohio Sept. 30, 2022) (concluding that the plaintiff stated a plausible claim for denial of the right to cross-examine in a case involving hazing and fatal alcohol intoxication). Accordingly, the Court is not persuaded by Defendants' argument.

Defendants also contend that credibility was not relevant here because they were able to assess the seriousness of Hedrick's video without making any credibility determinations. However, Hedrick alleges that the hearing panel asked him about the stalking accusation, which suggests that the panel considered that accusation, and Hedrick's response to it, when making its determination. And because the threatening nature of Hedrick's video presents a close question, it is easy to see how that accusation might have impacted the panel's assessment. Where, as here, "credibility is in dispute and material to the outcome, due process requires cross-examination."

27

*Baum*, 903 F.3d at 584.  Accordingly, Hedrick has plausibly alleged that the panel was faced with "competing narratives" about the context for his video, but it denied him the opportunity to cross-examine his accuser regarding the stalking accusation.

### 3. Right to an Attorney

WMU's student policies allowed Hedrick to bring a "support person" to his disciplinary hearing, but those policies did not permit representation by an attorney at the disciplinary hearing, and Allbee allegedly told Hedrick that an attorney would not be permitted to speak at the hearing. (Compl. ¶¶ 240-41.)  Defendants note that students "may" have a right to counsel at disciplinary hearings "where the hearing is unusually complex or when the university itself utilizes an attorney." *Cummins*, 662 F. App'x at 449.  In *Cummins*, the Court of Appeals noted that the students' attorneys "were still permitted to be present and advise [them] in presenting their cases." *Id.*  "The added benefit of allowing active participation by an advisor here is minimal given the limited cross-examination of witnesses, the lack of complexity, and the fact that knowledge of evidentiary rules was not required." *Id.*  Defendants argue that Hedrick's proceedings were no different.

Hedrick suggests that an attorney is always necessary where cross-examination is involved. He provides no legal support for that argument, however.  Moreover, the Court discerns no basis for distinguishing this case from *Cummins*.  Hedrick does not allege that WMU used an attorney. Nor does he allege facts indicating that his case was particularly complex.  Accordingly, the Court will dismiss this aspect of Hedrick's procedural due process claim.

### E. Substantive Due Process (Count V)

"Substantive-due-process claims are 'loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience.'" *Miami Univ.*,

882 F.3d at 597 (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)).  Hedrick does not state a claim under either of these two categories.

First, the right to "'continued education at a public university'" is not an interest protected by the "'substantive protections of the Due Process Clause.'"  *See id.* at 598 (quoting *Martinson v. Regents of Univ. of Mich.*, 562 F. App'x 365, 375 (6th Cir. 2014)).

Second, Hedrick has not alleged conduct that shocks the conscience.  "Executive action shocks the conscience when it is 'arbitrary, or conscience shocking, in a constitutional sense.'"  *Id.* at 599 (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 547 (6th Cir. 2012)).  Hedrick has not alleged such conduct here.  He challenges his expulsion from WMU for sending a video containing content that the university construed to be a threat against another student.  The state's actions "'survive[] the scythe of substantive due process so long as [they are] rationally related to a legitimate state interest.'"  *Id.* (quoting *Valot*, 107 F.3d at 1228).  Hedrick's expulsion may have implicated other constitutional rights, but it was not arbitrary or conscience shocking.  Instead, it was rationally related to the school's interest in investigating and disciplining apparent threats of harm by one student against another.  Accordingly, the Court will dismiss Count V.

### F. Breach of Contract (Count VI)

Defendants contend that Hedrick does not state a breach of contract claim because he apparently relies upon WMU's student code as the basis for his contract.  The Michigan Court of Appeals "has implicitly rejected the contention that student handbooks, codes, or other informational materials create contracts, expressly or otherwise, between universities and their students."  *Lee v. Univ. of Mich.-Dearborn*, No. 284541, 2009 WL 1362617, at *2 (Mich. Ct. App. May 12, 2009).  Hedrick responds that he has "an implied contractual right to continued enrollment in the program that is a protected property interest."  *See id.* at *3.  But that "implied contractual right" to continued enrollment is not a right to sue a university for a violation of its student policies

or student codes. Instead, it is "a right to continued enrollment free from arbitrary dismissal," which is "functionally the same" as a right to procedural due process. *Id.* Accordingly, the Court will dismiss the breach of contract claim in Count VI.

## VI. QUALIFIED IMMUNITY

Finally, the individual defendants argue that they are entitled to qualified immunity for Hedrick's claims under § 1983. At the motion to dismiss stage, "'[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). In other words, the individual defendants are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Id.* (citation omitted). "If, taking all the facts [in Hedrick's complaint] as true and reading all inferences in [his] favor, [he] has not plausibly showed a violation of his clearly established rights, then the officer-defendant is entitled to immunity from suit." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "'The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply' and that 'the legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him.'" *Hart v. Hillsdale Cnty.*, 973 F.3d 627, 641 (6th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 585-86 (2018)). This inquiry must "be undertaken in light of the specific context of the case, not as a broad general proposition." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir.

2001).  "Although a defendant ordinarily bears the burden of proof for an affirmative defense, a plaintiff bears the burden of overcoming qualified immunity." *Crawford*, 15 F.4th at 760.

### A. First Amendment Claims

Regarding Hedrick's First Amendment claims, even when construing the facts in a light most favorable to him, it was not clearly established that expelling him from the university for sending a video to another student involving a display of firearms and a suggestion that he was shooting the recipient would violate his First Amendment rights.  The limitations on a university's ability to discipline such conduct are unclear.  Although the Court concludes that he states a plausible First Amendment claim, the Court is not persuaded that precedent was sufficiently clear that every reasonable official would have understood that Defendants' actions violated Hedrick's First Amendment rights.

For his part, Hedrick makes no meaningful response to Defendants' arguments regarding qualified immunity.  He cites *Mahanoy*, but that case did not involve university students, so its holding does not squarely govern this case.  Although the Court can infer how the principles in *Mahanoy* would apply to off-campus speech in the university setting, the law on that issue is not clearly established.  And it is not the Court's responsibility to articulate arguments on Hedrick's behalf.

### B. Due Process Claims

Similarly, it was not clearly established that Defendants' conduct, even when construed in the light most favorable to Hedrick, violated Hedrick's right to procedural due process.  Hedrick does not respond to Defendants' argument, so he has not satisfied his burden of overcoming their qualified immunity defense.

Therefore, Defendants Allbee, Anderson, and Montgomery are entitled to qualified immunity for Hedrick's § 1983 claims against them.

**VII. CONCLUSION**

Based on the foregoing, the Court will deny Hedrick's motion for a temporary restraining order, construed as a motion for a preliminary injunction.

The Court will grant in part and deny in part Defendants' motion to dismiss.  The Court will dismiss Count III (*Monell* liability), Count V (substantive due process), and Count VI (breach of contract) for failure to state a claim.  The Court will dismiss Count IV (procedural due process) solely to the extent Hedrick asserts that he was entitled to an attorney.  The Court will dismiss WMU and its Board of Trustees because they are immune from suit.  Finally, the Court will dismiss Hedrick's claim for damages against the individual defendants because they are entitled to qualified immunity.  Counts I, II, and IV remain in the case against the individual defendants in their official capacities.  Hedrick is not entitled to damages but he may be entitled to declaratory and/or prospective injunctive relief.

An order will enter consistent with this Opinion.


Dated: October 17, 2022                    /s/ Hala Y. Jarbou
                                           HALA Y. JARBOU
                                           CHIEF UNITED STATES DISTRICT JUDGE